JUDGE FURMAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2020 MAR -2 AM 11: 37

Patrick Stone

_____

_____

Write the full name of each plaintiff.

**20** CV **01818**

CV _____

(Include case number if one has been
assigned)

-against-

Joseph Fisher

_____

_____

_____

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

## COMPLAINT

Do you want a jury trial?
☑ Yes   ☐ No

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

---

Rev. 1/9/17

## I.  BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐  **Federal Question**

☑  **Diversity of Citizenship**

## A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

## B.  If you checked Diversity of Citizenship

### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff ,  ___Patrick Stone_____ , is a citizen of the State of
                  (Plaintiff's name)

Minnesota.
_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, Joseph Fisher _____, is a citizen of the State of
(Defendant's name)

Illinois.

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

Patrick                                    Stone
_____
First Name              Middle Initial      Last Name

1392 Cleveland Ave. S.
_____
Street Address

Saint Paul                              MN              55116
_____
County, City                            State           Zip Code

(651) 227-3183                          p.j.stone@icloud.com
_____
Telephone Number                        Email Address (if available)

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

| Joseph | Fisher | |
|---|---|---|
| First Name | Last Name | |

Current Job Title (or other identifying information)

5828 N. Wayne Ave.

Current Work Address (or other address where defendant may be served)

| Chicago | IL | 60660 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

| | | |
|---|---|---|
| First Name | Last Name | |

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| | | |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

| | | |
|---|---|---|
| First Name | Last Name | |

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| | | |
|---|---|---|
| County, City | State | Zip Code |

Defendant 4: _____

    First Name             Last Name

_____

    Current Job Title (or other identifying information)

_____

    Current Work Address (or other address where defendant may be served)

_____

    County, City         State        Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:   New York, New York; Chicago, Illinois; Saint Paul, Minnesota

Date(s) of occurrence:   At or around 2017 to present

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

1. Plaintiff Patrick Stone ("Stone") is an individual who resides in and is a citizen of the State of Minnesota.

2. Defendant Jospeh Fisher ("Fisher") is an individual who resides in and is a citizen of the State of Illinois.

3. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(1) in that this is a civil action between citizens of different states; the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs; and the Plaintiff and Defendant consented to the jurisdiction of this Court by written agreement.

4. Renewal Care Partners LLC (the "Company") is a limited liability company formed on or around June 30, 2011 under the laws of the State of New York, with its principal place of business located at 555 Madison Avenue, Fifth Floor, New York, New York 10022. The Company was formed to operate a home care services agency as provided for by Article 36 of the Public Health Law of the State of New York and the pursuit of any other lawful business purpose.

5. On February 25, 2014, Plaintiff and Defendant executed the Operating Agreement of the Company (the "Operating Agreement") at a board meeting held at 52 Vanderbilt Ave., Suite 1410, New York, New York 10017. A true and correct copy of the contract is attached to this complaint and incorporated by reference in it as Exhibit A.

6. Pursuant to the terms of the Operating Agreement, Plaintiff and Defendant each paid a contribution of $50,000 into the Company's designated bank account in exchange for receiving 10,000 shares in the Company, which are called Class A Units. Plaintiff and Defendant are thus equal owners of the Company, with each holding a Membership Percentage and Voting Interest of fifty percent (50%).

7. Accordingly, by the terms of the Operating Agreement, Plaintiff's consent is required for the determination of the compensation of Managers per § 4.5; the Company reimburses all reasonable and necessary expenses incurred on its behalf by Plaintiff per § 4.8; the Company pays Plaintiff quarterly distributions for payment of federal, state, and local taxes per § 6.1(c); and, per § 6.2, Plaintiff receives fifty percent (50%) of cash distributions of the Company's cash flow.

8. However, Plaintiff has received no payments from the Company from at or around 2017 to the present.

9. In or around December 2017, Fisher assumed oversight of the Company's accounting department, which was relocated to Chicago, Illinois where Fisher is based. Beginning at or around the time of the relocation of the accounting department to Chicago, Illinois, Fisher began misappropriating Company funds and otherwise paying himself distributions from the Company in excess of Stone's in violation of the Operating Agreement.

10. On June 11, 2018, an emergency board meeting of the Company was held at or around 3:00 p.m. E.S.T. at 52 Vanderbilt Ave., Suite 1410, New York, New York 10017. The meeting was called by Stone pursuant to the Operating Agreement to address regulatory issues. During the meeting, Stone stated that a full accounting of the money received, disposed of, or disbursed by the Defendant on behalf of the Company was required. Fisher refused and has continued to prevent a full accounting as of the date of the filing of this complaint.

CONTINUED ON ATTACHED PAGES

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Plaintiff requests that this Court:

A. Order Defendant to provide to Plaintiff a just and full accounting of the money or property received, disposed of, or disbursed by Defendant on behalf of the Company and of all other transactions between Plaintiff and Defendant.

B. Enter a judgment against Defendant and in favor of Plaintiff for the amount found due Plaintiff as a result of the accounting, plus pre- and post-judgment interest as allowed by law.

C. Award costs of suit to Plaintiff.

D. Grant Plaintiff all other relief that this Court deems just and proper.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| March 1, 2020 | | |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Patrick J. Stone | | |
| First Name | Middle Initial | Last Name |
| 1392 Cleveland Ave. S. | | |
| Street Address | | |
| Ramsey County, Saint Paul   MN   55116 | | |
| County, City | State | Zip Code |
| (651) 227-3183 | | p.j.stone@icloud.com |
| Telephone Number | | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☒ Yes   ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

## ADDITIONAL FACTS

11. Since the board meeting on June 11, 2018, Defendant has refused to have board meetings in violation of the Operating Agreement and regulatory requirements under Article 36 of the Public Health Law of the State of New York.

12. On or around July 23, 2018, an employee under Defendant's direction confessed to Plaintiff that falsified board minutes with forged signatures for board meetings that never occurred had been provided to officials from the New York Department of Health in response to their request for documents pursuant to the Company's first audit for its licensure. If the Company failed the audit and lost its licensure, it could no longer operate. This was consistent with Plaintiff's concerns that an independent accounting of the Company's finances and compliance was required.

13. On or around August 6, 2018, Defendant falsely claimed that Plaintiff resigned from the Company, relinquishing all rights and control solely to him. Defendant then denied Plaintiff's demands for compensation, reimbursements, quarterly distributions for payment of taxes, and other distributions owed to Plaintiff under the Operating Agreement.

14. On or around September 4, 2018, without prior notice or board authorization, Defendant removed Plaintiff from the Company's bank accounts at JPMorgan Chase Bank, N. A., which had been opened at a branch in New York, New York on or around July 5, 2011 with a board resolution per the Operating Agreement. Approximately $398,020.11 in withdrawals were then made from the account at JPMorgan Chase Bank, N. A. in New York such that, by October 31, 2018 its remaining balance was $2,355.71. These withdrawals appear to have consisted in transfers to Defendant's personal bank account in Chicago, Illinois and to a checking account at Third North Bank in Chicago, Illinois opened on behalf of the Company without Plaintiff's prior knowledge or consent.

15. On or about October 31, 2018, without prior discussion with Plaintiff or board authorization, Defendant declined to renew the five-year lease of the Company's principal offices located at 52 Vanderbilt Avenue, New York, New York, 10017. Defendant appears to have then sold all of the Company's office furniture and equipment (e.g., Knoll desks and chairs, photocopiers, printers, medical supplies and equipment collectively worth hundreds of thousands of dollars) and taken the security deposit of $43,028.35 for himself.

16. By the time Plaintiff had obtained sufficient funds to return to New York City, Defendant had relocated the Company to a co-working space at 555 Madison Avenue, 5th Floor, New York, New York, 10022. The receptionists at this co-working space have denied Plaintiff's attempts to visit the offices and return to work. Because Defendant did not include Plaintiff's name on the new lease, and because key executives who knew Plaintiff at the Company have either left or been terminated by Defendant, Plaintiff has no way of entering the offices of the Company that Plaintiff formed.

17. With the assistance of Heather M. Grove of Caliber Advisors, Inc., Defendant then proceeded to perform a fraudulent valuation of Plaintiff's shares of the Company, which was finalized on or around November 15, 2018. Defendant has since used this fraudulent valuation as the basis of a lawsuit filed in the Supreme Court of New York County in the State of New York, which seeks to force Plaintiff to sell him his shares for millions of dollars below fair market value.

18. On or about November 19, 2018, Plaintiff became aware that the Company had paid Katie Sherman, an employee of the Company who was Defendant's nanny, at or around $13,813.01 in 2016; $43,842.69 in 2017; and $33,900.57 in 2018. Plaintiff has been unable to verify whether the Company's payments were properly classified for tax purposes as income to the Defendant.

19. On or about December 1, 2019, Plaintiff's accountant advised Plaintiff that he cannot file state and federal taxes for Plaintiff without an audit of the Company by an independent, third-party accountancy.

20. On or about December 5, 2019, Defendant restored Plaintiff's online access to the Company's accounting software. This resulted in evidence that the Company appears to have paid $20,231.93 to cover the cost of Defendant's credit card for October 2019 alone. Virtually no transparency is provided into any of these expenses. However, based on the limited accounting data Plaintiff was able to access, Defendant appears to have used Company funds for purchases from Starbucks, Whole Foods, Target, Apple, New York Times Digital, 7-Eleven, Shell Oil, and Duane Reade, among other retailers. None of these purchases are likely to be legitimate business expenses, especially given no supporting receipts or other documentation are provided. These transactions suggest Defendant is misappropriating Company funds for his personal use on everything from groceries to gas, notwithstanding music downloads from Apple and lattes from Starbucks. There is evidence Defendant is using Company funds to make car payments, too.

21. Based upon the foregoing, Defendant has failed and refused to pay money owed to Plaintiff, or any part of it, or to account for the funds to Plaintiff. Plaintiff has performed all the conditions of the Operating Agreement and has no means of ascertaining the exact amount of money belonging to him that is in the possession of the Defendant. Thus the amount of money that the Defendant owes to the Plaintiff can only be ascertained by a full and complete accounting of all transactions made by the Defendant with respect to the funds deposited by Plaintiff.

**EXHIBIT A**

**OPERATING AGREEMENT**
**OF**
**RENEWAL CARE PARTNERS LLC**

This OPERATING AGREEMENT of Renewal Care Partners LLC, a New York limited liability company (the "Company"), dated as of February 25th, 2014, by and among the Members identified on Schedule A attached hereto.

<u>RECITALS</u>

WHEREAS, the Members have formed the Company as a New York limited liability company by the filing of articles of organization on June 30th, 2011 with the Department of State of New York pursuant to and in accordance with § 203 of the New York Limited Liability Company Law (as it may be amended from time to time, and any corresponding provision of any succeeding or successor acts of the State of New York, the "LLC Law"); and

WHEREAS, the Members agree that their respective rights, powers, duties and obligations as Members of the Company, and the management, operations and activities of the Company, shall be governed by this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Members hereby agree as follows:

Section 1.     <u>Definitions</u>.

1.1     <u>Defined Terms</u>.

The following terms shall have the meanings specified in this Section 1:

"Agreement" shall mean this Operating Agreement, as originally executed and as it may be amended, restated, modified or supplemented from time to time.

"Applicable Rate" means a rate of interest equal to the greater of (i) the "Prime Rate" listed in The Wall Street Journal or any similar successor rate, or (ii) the minimum interest rate that can be charged under the Code to avoid reallocation of all or part of the purchase price of the Units acquired or sold hereunder as interest.

"Articles of Organization" shall mean the Company's Articles of Organization, as originally filed with the Department of State of New York on June 30th, 2011, as they may be amended from time to time under the LLC Law.

"Bona Fide Offer" means the individual capital account of a Member, which is maintained in accordance with the provisions of this Agreement.

"Capital Account" shall have the meaning provided in Section 5.5(a).

"Capital Contribution" shall mean the amount of cash and the fair market value of any other property (net of any liabilities secured by such property that the Company assumes or takes

subject to) at any given time contributed to the Company by each Member as an initial Capital Contribution or an additional Capital Contribution. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member with respect to the Interest of such then Member.

"Cash Flow" shall mean, for any fiscal period, the excess of Gross Income for the period over cash expenditures made by the Company for the period, including: (a) operating expenses of the Company and (b) provisions for working capital or other reserves taken in accordance with Section 6.1(b). Cash Flow shall not include any Capital Contributions and shall not be reduced by expenditures funded by Capital Contributions.

"Claim" shall have the meaning set forth in Section 16.3.

"Class A Members" means Members holding Class A Voting Units.

"Class A Voting Units" or "Class A Units" means those Interests entitled to vote, as set forth on Exhibit A to this Agreement.

"Class B Members" means Members holding Class B Non-Voting Units.

"Class B Non-Voting Units" or "Class B Units" means those Interests equal in all other respects to the Class A Voting Units, except that the Class B Non-Voting Units are not entitled to vote, as set forth on Exhibit A to this Agreement.

"Closing" means that time described in Section 14.1 at which any sale of Units required or permitted by the terms of this Agreement shall be effectuated and at which time the parties will perform the acts required to be performed at Closing pursuant to Section 14 and the other terms and provisions of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as it may be amended from time to time, and any successor to the Code.

"Company" shall mean Renewal Care Partners LLC, the New York limited liability company governed hereby.

"Competition" shall mean that a Member is, directly or indirectly, on his own behalf or as a partner, officer, employee, consultant, agent, shareholder, member, director or trustee of any person, firm, corporation, limited liability company or other entity, engaged or participating in or rendering services to any person, corporation, partnership, association, enterprise or organization however formed or in whatever manner conducted which, in the conduct of its business in the normal course, is engaged in providing home health care services in an area which the Company has not previously declined to engage in, or has not been prohibited by a third party from engaging in, as a company opportunity, after receipt of full and fair disclosure from the Member engaged in such conduct. Ownership of less than five percent (5%) of any company which is engaged in Competition and the equity ownership of which is publicly traded shall not constitute Competition.

"Covered Person" shall have the meaning set forth in Section 16.1.

"Depreciation" shall mean, for any fiscal period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable under the Code for a Company asset for such period. However, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the period, Depreciation shall be an amount that bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for the period bears to the beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for the asset for the period is zero, Depreciation shall be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Managers.

"Disabled" means the disability of a Member by reasons of injury or illness, whether physical or mental, which prohibits or would prohibit that Member from serving as a governor or manager of the Company for a period of great than six (6) consecutive months or nine (9) months in any twelve (12) month period.

"Distribution Date" shall have the meaning set forth in Section 15.3.

"Escrow and Pledge Agreement" shall have the meaning ascribed to it in Section 14.4.

"Fair Market Value" of any Units means an amount equal to (x) the aggregate cash present value of all of the Units of the Company as determined in accordance with the terms of Section 12 multiplied by (y) the Membership Percentage of the relevant Units.

"Financially Impaired" means, with respect to any Member, (a) the bankruptcy or insolvency of such Member, (b) the filing on behalf of or against such member of a voluntary or involuntary proceeding in bankruptcy or receivership in a court of competent jurisdiction or appointment of a trustee or receiver as a result of a said action and proceeding in a court of competent jurisdiction and the continuance of such proceeding for a period of ninety (90) days without dismissal or (c) the entry by such Member into any arrangement, composition or reorganization for the benefit of creditors.

"Grantor Trust" means a trust, all the assets and the entire income interest of which is treated under the Code as owned by the Member creating such trust and which trust provides that the primary beneficiary and a trustee of the trust shall be the Member creating the trust; and provided, further, that such trust qualifies as a trust described in Section 1361(c)(2)(A)(i) of the Code.

"Gross Asset Value" shall mean the fair market value of each item of Company property on the date of its contribution to the capital of the Company and the adjusted basis for federal income tax purposes of each other item of Company property acquired by the Company, except that the Gross Asset Value of each item referred to in this definition shall be adjusted to equal its fair market value at the time of any of the events described in Section 5.7(b)(i).

"Gross Income" shall mean, for any fiscal period, all cash receipts of the Company and all other monies otherwise received by the Company for such period, excluding only Capital Contributions and any loans to the Company from any Person.

Operating Agreement of Renewal Care Partners LLC

"Interest" shall mean the entire interest of a Member as a member in the Company, including: the Member's interest in the Company's assets, liabilities and capital, the right to participate in allocations of Net Income or Net Loss and to receive distributions from the Company; and all other rights and obligations of the member under this Agreement and the LLC Law. An Interest shall be personal property for all purposes, and shall be expressed as a number of Units. When used in reference to a member or Members, the term "Interest" means all Interests then owned by that Member or those Members.

"LLC Law" shall have the meaning set forth in the Recitals to this Agreement.

"Managers" shall mean the Persons serving as Managers pursuant to Section 4.1, in each such Person's capacity as a Manager of the Company.

"Member" shall mean each Person named as a Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in such Person's capacity as a Member of the Company. Any reference in this Agreement to a Member which is a Grantor Trust shall also refer to the Person who as grantor created that Grantor Trust.

"Membership Percentage" shall mean, for each Member, the percentage obtained by dividing such Member's total number of Units by the aggregate amount of all issued and outstanding Units.

"Membership Units" or "Units" means the ownership Interests described in Section 3.2 hereto, which may be Class A Voting Units or Class B Non-Voting Units.

"Net Income" or "Net Loss" shall mean, for any fiscal period, an amount equal to the Company's Taxable Income or Tax Loss, as the case may be, for such period, subject to the following adjustments:

(i)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition shall be added to Taxable Income or Tax Loss;

(ii)    any expenditures of the Company described in Code § 705(a)(2)(B) or treated as Code § 705(a)(2)(B) expenditures under Regulation § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Income or Net Loss under this definition shall be subtracted from Taxable Income or Tax Loss in the period paid, and shall not be taken into account in any other period;

(iii)   if the Gross Asset Value of any Company property is adjusted under Section 5.7(b)(i), then (i) the amount of the adjustment shall be taken into account as a gain or loss on the disposition of such property immediately before the event causing the adjustment for purposes of computing Net Income or Net Loss, and (ii) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing Taxable Income or Tax Loss, there shall be taken into account Depreciation for such period, computed in accordance with the definition of Depreciation herein;

Operating Agreement of Renewal Care Partners LLC

(iv)    gain or loss resulting from any disposition of Company property for which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value less Depreciation of the property disposed of, notwithstanding that the adjusted tax basis of the property may differ from its Gross Asset Value less Depreciation; and

(v)    notwithstanding any other provision of this definition of Net Income and Net Loss, any items comprising the Company's Net Income or Net Loss that are allocated under Section 5.7(b) shall not be taken into account in computing Net Income or Net Loss.

"Notice Date" shall have the meaning ascribed to it in Section 8.2.

"Notice of Bona Fide Offer" shall have the meaning ascribed to it in Section 8.1.

"Permitted Transfers" shall have the meaning ascribed to it in Section 7.3.

"Person" shall mean any individual, partnership, corporation, governmental authority, limited liability company, unincorporated organization or association, trust or other entity.

"Promissory Note" shall have the meaning set forth in Section 14.3.

"Purchaser" means a Person, including, if applicable, the Company or any Remaining Member, who has elected to acquire Units of any Transferring Member.

"Remaining Members" means, in the event any Member constitutes a Transferring Member under this Agreement, all Class A Voting Members other than the Transferring Member.

"Retirement" means the termination of employment of a Member which occurs after the Member's sixty-fifth (65th) birthday or which is mutually determined by the retiring Member and a majority of the Managers to be said Member's retirement.

"Tax Distribution" shall have the meaning set forth in Section 6.1(c).

"Tax Matters Partner" shall have the meaning set forth in Section 17.6.

"Taxable Income" or "Tax Loss" shall mean, for any fiscal period, an amount equal to the Company's taxable income or loss for the period determined under Code § 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code § 703(a)(1) shall be included in taxable income or loss).

"Transfer" means any proposed, claimed or asserted voluntary or involuntary disposition of any Units, other than a Permitted Transfer, by any Member or by his agent, executor, administrator, trustee, receiver or other legal representative in any manner whatsoever including, but not limited to, the following: disposition by gift, sale, exchange or devise, pledge, mortgage, assignment, grant of a security interest or other encumbrance, attachment, levy of execution or seizure by creditor whether or not by judicial process, assignment for the benefit of creditors,

distribution by executor, administrator or trustee, and passage under any judicial order or legal process in law or equity, including passage by reason of descent and distribution, dissolution of marriage, bankruptcy, legal incapacity or insanity and transfer to a receiver for the administration of property of a Member.

"Transferring Member" shall mean a Member whose Units, whether voluntarily or involuntarily, become subject to a Transfer, or whose Units become subject to any of the options contained in this Agreement by reason of the occurrence of any events set forth in Section 8, Section 9, Section 10, or Section 11.

"Treasury Regulations" shall mean the regulations (including any temporary regulations) issued under the Code by the Department of the Treasury, as they may be amended from time to time, or any applicable successor regulations. Reference herein to any particular section of the Treasury Regulations shall be deemed to refer to the corresponding provision of any applicable successor regulations.

"Valuation Date" shall mean the last day of the last full month preceding the month in which any Transfer or other event giving rise to an option or obligation to purchase Units provided in this Agreement occurs.

"Voting Interest" means the "Voting Interest" reflected on Exhibit A for each Member holding Class A Voting Units.

Section 2.    Organization.

2.1    Formation and Qualification.  The Members hereby agree to form and ratify the formation of the Company that was effected through the filing of the Articles of Organization under § 203 of the LLC Law. The Managers shall cause to be executed, filed and (where required) published from time to time such further certificates, notices, statements or other instruments required by law for the operation of a limited liability company in all jurisdictions where the Company is required to qualify or to be authorized to do business as a foreign limited liability company, or as otherwise necessary to carry out the purpose of this Agreement and the business of the Company.

2.2    Name.  The name of the Company is "Renewal Care Partners LLC". The Company may adopt and conduct its business under such assumed or trade names as the Managers shall from time to time determine. The Company shall file any assumed or fictitious name certificates as may be required to conduct business in any state.

2.3    Purposes and Powers.  The powers and the purposes of the Company are limited to the establishment and operation of a home care services agency as provided for by Article 36 of the Public Health Law of the State of New York and implementing regulations and the pursuit of any other lawful business purpose or purposes, except to do any business for which another statute of the State of New York or any other applicable jurisdiction specifically requires some other business entity or natural person to be formed or used for such business and to engage in any and all activities necessary or incidental to the foregoing.

Operating Agreement of Renewal Care Partners LLC

2.4    <u>Principal Office</u>. The location of the principal office of the Company shall be 52 Vanderbilt Avenue, Floor 14, New York, New York, or such other location as the Managers may, from time to time, designate upon notice to the Members.

2.5    <u>New York State Department of State Process</u>. The New York State Department of State shall mail process on behalf of the Company to Patrick O'Brien, 52 Vanderbilt Avenue, Floor 14, New York, New York. The Managers may, in their discretion, designate a different registered agent, in conformity with the provisions of § 302 of the LLC Law, upon whom process against the Company may be served, and may change any designated agent from time to time.

2.6    <u>Duration</u>. The term of the Company commenced on June 30, 2011, the date upon which the Articles of Organization were filed with the Secretary of State of New York, and shall continue in full force and effect until the Company is dissolved in accordance with the provisions of this Agreement and the LLC Law.

2.7    <u>Payment of Costs and Expenses</u>. The Company shall pay all legal, accounting and administrative fees incurred in connection with the structuring and organization of the Company.

Section 3.    <u>Members</u>.

3.1    <u>Members</u>. Each of the Members shall be Members of the Company until they cease to be Members in accordance with the provisions of this Agreement or the LLC Law.

3.2    <u>Units</u>. Except as otherwise provided herein, the Interest of each Member of the Company shall be expressed and evidenced by the issuance of a particular number of Units. The Units shall be of two types, Class A Voting Units and Class B Non-Voting Units. Holders of Class A Voting Units shall be entitled, except to the extent limited under these Articles, the Bylaws or this Agreement, to all of the rights and privileges of members of a limited liability company under the LLC Law. Holders of Class B Non-Voting Units shall enjoy the same rights and privileges as holders of Class A Voting Units; provided, however, that holders of Class B Non-Voting Units shall not, to the fullest extent permissible under the LLC Law, be entitled to any voting rights with respect to such Class B Non-Voting Units. The names of the Class A Voting Members and their respective contributions and the agreed value thereof are reflected on Schedule A, attached hereto. The amounts shown on Schedule A with respect to the Units, Capital Contributions and Membership Percentages shall be appropriately amended from time to time to reflect changes to such amounts as a result of any additional Capital Contributions, any changes in the membership of the Company or Transfers of Interest.

3.3    <u>Control by Managers; Members Are Not Agents</u>. Except as may otherwise be provided by this Agreement or the LLC Law, the Members shall not participate in the control or management of the business of the Company (except for any Member who is also a Manager, and then only in such Member's capacity as a Manager). The Members are not agents of the Company and do not have the authority to act for, or bind, the Company in any matter.

3.4    <u>Meetings of Members</u>. Meetings of the Members may be called at any time for any purpose by the Managers or by Members holding at least fifty percent (50%) of the issued

and outstanding Class A Voting Units. Annual meetings shall not be required. Notices of meetings of Members shall be given not less than ten (10) nor more than sixty (60) days prior to the meeting. Notice of any meeting may be waived at any time, and presence at any meeting shall constitute a waiver of notice. Members may participate in a meeting of the Members by means of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear and speak to each other, and such participation in a meeting shall constitute presence in person at the meeting. Members shall vote in proportion to their Voting Interest. A quorum shall consist of a majority of the Class A Members or any greater percentage of the Voting Interests required to approve the matters under consideration. Members may also act by written consent in accordance with § 407 of the LLC Law. Members holding the requisite Voting Interest may also agree to any action without a meeting or written consent.

3.5    Conflicts of Interest.  No Member shall engage in Competition, for so long as such Member is a Member, in any territory in which the Company conducts or actively plans to conduct its business, except in the name and on behalf of the Company.

3.6    Securities Law.  Each Member acknowledges that the Units have not been registered under the Securities Act of 1933, as amended, or any state securities laws, as they are being acquired in a transaction not involving a public offering, and, under such laws, may not be resold or transferred by any Member without appropriate registration or the availability of an exemption from such requirements.

Section 4.    Management Rights and Duties.

4.1    Management Generally.  Subject to the provisions of this Agreement and the LLC Law, the business and affairs of the Company shall be conducted, and all its powers shall be exercised, by or under the direction of the Managers. The number of Managers shall be fixed by the Members from time to time by the vote of the Members holding a majority of the Voting Interests. The initial number of Managers shall be two (2). The initial Managers shall be Patrick O'Brien and Joseph Fisher. The Managers shall be "managers" within the meaning of the LLC Law. The Managers shall be appointed by and serve at the pleasure of the Members, who may at any time remove a Manager, with or without cause, by action of a majority of the Voting Interests or appoint additional or replacement Managers by action of a majority of the Voting Interests. A Manager may resign at any time upon giving written notice at least thirty (30) days in advance. If any Manager is unable or unwilling to continue to serve as a Manager, and one or more Managers remains, then the remaining Manager(s) shall continue to serve as Manager(s). A majority of the Voting Interests may appoint additional or successor Managers at any time.

4.2    Manner of Action by the Managers.  If at any time the number of Managers is two (2), then any action to be taken by the Managers may be taken only by their unanimous approval, and if the number of Managers is three (3) or greater, any action to be taken by the Managers may be taken only with the approval of a majority in number of the Managers. Formal meetings or votes of the Managers shall not be required to approve any action so long as the requisite number of Managers has approved the action.

4.3    <u>Authority of Managers.</u>  Except as otherwise provided in this Agreement or the LLC Law, the Managers shall have exclusive control of the business of the Company.  Without limiting the generality of the foregoing, but subject to Section 4.4, the Managers shall have the power and authority, on behalf of the Company, to:

(a)    supervise and manage the business of the Company;

(b)    appoint, remove and replace at their pleasure agents and employees of the Company, define their duties, fix their compensation, and enter into written agreements with such agents and employees;

(c)    enter into, make, perform and carry out all types of contracts, and execute any and all other instruments as they shall deem necessary or appropriate;

(d)    purchase, lease or otherwise acquire any real or personal property in connection with or relating to the business of the Company;

(e)    receive, buy, sell, exchange or otherwise dispose of Company interests;

(f)    prepare all reports required by any governmental or administrative agency;

(g)    file, on behalf of the Company, all required local, state and federal tax returns, annual reports, and other documents relating to the Company,

(h)    cause the Company to carry such property and casualty, liability and other insurance as the Managers may deem necessary or appropriate;

(i)    cause the Company to purchase or bear the cost of any insurance covering the potential liabilities of the agents, officers and employees of the Company in carrying out their responsibilities for the Company;

(j)    make disbursements of money in the ordinary course of business; open, maintain, and close bank accounts and draw check or other orders for the payment of monies;

(k)    borrow money on behalf of the Company upon such terms and conditions as the Managers may deem necessary or appropriate; execute promissory notes, drafts and other instruments and evidences of indebtedness, and secure the payment thereof by mortgage, pledge or assignment of, or security interest in, all or any part of the Company assets; and refinance, recast or modify any of the obligations of the Company and the instruments securing those obligations;

(l)    deposit any available cash with such banks, thrift institutions or other associations as the Managers may deem appropriate; invest any available cash in such other investments as the Managers may deem appropriate, and withdraw, pay, retain and distribute the Company's funds in a manner consistent with the purposes of this Agreement;

Operating Agreement of Renewal Care Partners LLC

(m)     make such elections under the Code and other relevant tax laws as to the treatment of items of Company income, gain, loss and deduction, and as to all other relevant matters, as the Managers deem necessary or appropriate, including, without limitation, elections referred to in Section 754 of the Code, determination of which items of cash outlaw are to be capitalized or treated as current expenses, and selection of the method of accounting and bookkeeping procedures to be used by the Company;

(n)     cause the Company to make distributions from time to time;

(o)     bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company; and

(p)     take any and all other action that is permitted under the LLC Law and that is customary or reasonably related to the ordinary business of the Company.

4.4     <u>Limitations on Authority</u>.  The Managers shall not have the authority to take any of the following actions on behalf of the Company without the consent of holders of two-thirds (2/3) of the Voting Interests:

(a)     sell, lease, exchange or otherwise dispose of all or substantially all of the Company's assets;

(b)     merge, consolidate or otherwise provide for any business combination of the Company with any other limited liability company, corporation or other business entity;

(c)     enter into any transaction that would result in a change in control of more than fifty percent (50%) of the Interests in the Company;

(d)     issue any additional Interests to new or existing Members in exchange for Capital Contributions or admit any new Members to the Company;

(e)     reorganize or convert to a form of entity other than a limited liability company;

(f)     make any election to be taxed as a corporation; or

(g)     make any voluntary filing or consent to any involuntary filing against the Company under any bankruptcy or insolvency law, or make a general assignment for the benefit of creditors, or admit that the Company cannot pay its debts as they become due.

4.5     <u>Compensation of the Managers</u>.  The Managers of the Company who are active in the daily business of the Company shall be entitled to compensation for services rendered to the Company as determined by the Managers with the consent of a majority of the Voting Interests. The Managers shall be reimbursed for all reasonable and necessary expenses incurred on behalf of the Company.

4.6    Reliance by Third Parties. Persons dealing with the Company are entitled to rely conclusively upon the certificate of the Managers to the effect that the Managers are then acting as the Managers and upon the power and authority of the Managers as herein set forth.

4.7    Standard of Care. A Manager shall perform his or her duties as a Manager in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances. In performing his or her duties, a Manager shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by (a) one (1) or more agents or employees of the Company or (b) counsel, public accountants or other Persons as to matters that the Manager believes to be within such Person's professional or expert competence. A Person who so performs his or her duties in accordance with this Section 4.7 shall have no liability by reason of being or having been a Manager of the Company.

4.8    Officers: Delegation of Authority. The Managers may delegate their power and authority to one (1) or more officers, employees or agents of the Company. The Managers may appoint a President, Secretary, Treasurer and such other officers as the Managers from time to time may deem appropriate and may set their compensation. The compensation of any officer who is also a Manager shall be approved by consent of the holders of a majority of the Voting Interests. The duties of the officers of the Company shall be such as are traditionally associated with their respective offices in a New York corporation and as may be prescribed from time to time by the Managers. Except to the extent officers are appointed and authority delegated hereunder, management authority shall remain with the Managers. The Managers may remove and replace officers at any time for any reason or for no reason. Any number of offices may be held by the same person, and the Managers may hold any such offices.

4.9    Other Interests. No Manager shall engage in any business activity in competition with the business activities currently conducted or under active planning by the Company, for so long as such Manager is a Manager, in any territory in which the Company conducts or actively plans to conduct its business, except in the name and on behalf of the Company.

4.10    Changes to Management Structure. Neither the management structure of the Company nor the provision stating forth such structure may be deleted, modified, or amended without the prior approval of the New York State Department of Health.

4.11    Due Consideration to Stakeholders. In discharging his or her duties, and in determining what is in the best interests of the Company and its Members, no Manager shall be required to regard any interest, or the interests of any particular group affected by such action, as a dominant or controlling interest or factor. The Managers shall give due consideration to the following factors, including, but not limited to, the long-term prospects and interests of the Company and its Members; the social, economic, legal, or other effects of any action on the current and retired employees; the suppliers and customers of the Company or its subsidiaries; and the communities and society in which the Company or its subsidiaries operate, (collectively, with the Members, the "Stakeholders"), together with the short-term, as well as long-term, interests of its Members and the effect of the Company's operations (and its subsidiaries' operations) on the environment and the economy of the state, the region and the nation. Nothing in this Article, express or implied, is intended to create or shall create or grant any right in or for

any person or any cause of action by or for any person. Notwithstanding the foregoing, any Manager is entitled to rely upon the definition of "best interests" as set forth above in enforcing his or her rights hereunder and under New York State law, and such reliance shall not, absent another breach, be construed as a breach of a Manager's fiduciary duty of care, even in the context of a Change in Control Transaction where, as a result of weighing other Stakeholders' interests, a Manager determines to accept an offer, between two competing offers, with a lower price per unit.

Section 5.    Capital Accounts and Allocations.

5.1    Initial Capital Contributions.  Schedule A hereto sets forth the Capital Contribution to the Company made by each Member as of the date hereof. Contemporaneously with the execution of this Agreement, each Member shall contribute the amount set forth opposite such Member's name on Schedule A in cash or by wire transfer.

5.2    Additional Capital Contributions.  The Members shall have the right to contribute any additional funds required by the Company to conduct the business of the Company in such proportions as they determine. Such amounts shall constitute additional Capital Contributions of the Members. If the holders of a majority of the Voting Interests determine for any reason that additional funds are necessary to meet any current or future obligation of the Company, with the consent of the holders of a majority of the Voting Interests, Members may be required to make advances to the Company. If such request is made, the Members may make advances to the Company pro rata in accordance with their Membership Percentages. If for any reason a Member fails to contribute the required additional funds, other Members shall have the right to contribute such funds, with Membership Percentages adjusted accordingly.

5.3    No Interest on Capital Contributions.  No Member shall be paid interest on any Capital Contribution.

5.4    Member Loans.  A Member may loan money to, and transact business with, the Company, subject to approval of the Managers and holders of a majority of the Voting Interests. A payment by any Member of any amount under a guaranty by such Member of any obligation of the Company shall be treated as an advance of funds to the Company unless characterized otherwise by the Managers.

5.5    Capital Accounts.

(a)    The Company shall maintain an individual capital account (a "Capital Account") for each Member on its books and records in accordance with the following provisions. The maintenance of Capital Accounts shall not prevent the intermingling of the funds of the Company in common accounts.

(b)    Each Member's Capital Account shall be increased (credited) by: (i) the amount of any cash Capital Contribution made by such Member; (ii) the Gross Asset Value of any Capital Contribution made other than in cash by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to Code § 752); and (iii) the amount of Net Income allocated to the Member under Section 5.6.

Operating Agreement of Renewal Care Partners LLC

(c)     Each Member's Capital Account shall be reduced (debited) by: (i) the amount of cash distributed to such Member by the Company; (ii) the Gross Asset Value of any property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to Code § 752); and (iii) the amount of Net Losses allocated to the Member under Section 5.6.

(d)     If any Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account relates to the transferred Interest.

(e)     The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation § 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulation.

5.6     Allocation of Net Income and Net Loss.  After giving effect to the special allocations required by Section 5.7(b), Net Income and Net Loss shall be allocated to the Members in proportion to their Membership Percentages.

5.7     Tax Allocations.

(a)     All items of income, gain, loss and deduction shall be allocated among the Members for federal income tax purposes in accordance with the allocation of Net Income or Net Loss (and items thereof) as provided for in this Agreement.

(b)     Notwithstanding anything herein to the contrary, and consistent with all applicable Treasury Regulations:

(i)     Any special allocations required under § 704(c) of the Code and the Treasury Regulations promulgated under § 704(b) of the Code, shall be made for the contribution of any appreciated property to the Company and the revaluation of such property;

(ii)     For federal income tax purposes, each Member's Capital Account shall be adjusted as required by Treasury Regulation s 1.704-1(b)(2)(ii)(d)(4), (d)(5) and (d)(6), and items of the Company Gross Income shall be specifically allocated to each Member in an amount and manner sufficient to eliminate any deficit in such Member's Capital Account as quickly as possible. This provision is intended to be a "qualified income offset" within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(d)(3), and shall be interpreted consistently therewith; and

(iii)     Such other allocations shall be made that are necessary for the Company's allocations to comply with the requirements of the Code and the Treasury Regulations.

5.8     Withdrawal of Capital.  No Member shall have the right to withdraw from the Company all or any part of the Member's Capital Contribution. No Member shall have the right

Operating Agreement of Renewal Care Partners LLC

to demand any distribution other than upon the dissolution and liquidation of the Company. If a Member is to receive a distribution or return of capital, whether upon dissolution or liquidation of the Company or otherwise, such member shall only have the right to receive that distribution or return of capital in cash. Such Member may receive a distribution or return of capital in kind at the direction of the Managers; provided, however, that no Member may be compelled to accept a distribution of any asset in kind to the extent that the percentage of the asset distributed to the Member exceeds the Member's Membership Percentage.

5.9    Adjustments to Take Account of Interim Events.  If the other Members permit a Member to withdraw from the Company or make an addition to or withdrawal from such Member's Capital Account as of a date other than the last day of a month, the Managers shall make such adjustments in the determination and allocation among the Members of items of Net Income or Net Loss, for purposes of this Agreement as shall equitably take into account such interim event, and the determination thereof by the Managers shall be final and conclusive as to all of the Members.

5.10    Offset and Indemnification.  The Company may offset all amounts owing to it by a Member (including any tax payments the Company may be required to make on behalf of a Member) against any amounts that would otherwise have been distributed to such Member. If the distributions are insufficient to repay the Company for amounts owing to it by a Member, the amounts owing shall be offset against any liquidation proceeds otherwise payable to the Member. Further, each Member shall indemnify and hold harmless the Company and other Members from and against any liability (including any liability for taxes, interest and penalties) that results from any allocations of Net Income, distributions, or other payments to the Member.

5.11    No Interest on Capital Accounts.  No interest shall be paid on any Member's Capital Account.

5.12    Source of Distributions.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and the Member's Capital Contribution thereto and shall have no recourse therefore (*upon dissolution or otherwise*) against the Managers or the other Members.

Section 6.    Distributions.

6.1    Distributions Generally.

(a)    Subject to Section 6.1(c) below, the time and amount of any distributions of Cash Flow shall be determined by the Managers acting in their sole discretion.

(b)    The Company may retain funds necessary to cover its reasonable business needs, which may include reserves against anticipated expenses and possible losses and the payment when due of obligations of the Company, and may retain funds for any other Company purposes. The Managers shall determine the amounts of such reserves and the purposes for which such reserves shall be made.

(c)    If and to the extent that the Company is earning Taxable Income that will result in the Members being subject to income tax on their distributive share of the

Company's Taxable Income, the Company will endeavor to make quarterly distributions to the Members in amounts intended to enable the Members to pay their United States federal, state and local income tax liabilities resulting from allocations made pursuant to Section 5.6 herein (a "Tax Distribution"). The amount of the Tax Distribution shall not exceed the product of (i) the maximum combined U.S. federal and New York income tax rate applicable to an individual on ordinary income or capital gains, as applicable and (ii) the cumulative amount of Net Income allocated to the Members reduced by the cumulative amount of Net Losses previously allocated to them.

6.2    Apportionment of Distributions to Members.  Except as otherwise provided in Section 6.1, distributions of Cash Flow shall be made to each Member in proportion to such Member's respective Membership Percentages.

Section 7.    Transfers of Membership Interests.

7.1    Interest Transfers, Assignments, or Other Dispositions Generally: The transfer, assignment, or other disposition of the Interest or Voting Interest of any Member must be effectuated in accordance with Section 3611-a(1) of the Public Health Law of the State of New York.

7.2    Restrictions on Transfer of Interests.  A Member may assign the Member's full Interest only by assigning all of the Member's governance rights, if any, coupled with a simultaneous assignment to the same assignee of all of the Member's financial rights. Except for Permitted Transfers described in Section 7.3, unless the prior written consent of the Company and all Class A Voting Members has first been obtained, no Member or his respective agent, executor, administrator, trustee, receiver or other legal representative shall at any time Transfer his Class A Units except in accordance with the provisions of this Agreement and any attempt to do so will be null and void *ab initio*. The provisions of Section 7 through Section 14 shall not apply to the transfer of Class B Units.

7.3    Permitted Transfers.  Transfers by a Member during his lifetime to a Grantor Trust of which he is both primary beneficiary and trustee, or by a Grantor Trust to the Member who as Grantor created the Grantor Trust and which are made in compliance with Section 8.5 shall constitute a Permitted Transfer. Any reference in this Agreement to the Units held by a Member shall refer also to any Units held by a Grantor Trust established by such Member as if such Units were held by a Grantor Trust established by such Member as if such Units were held by the grantor Member in his individual capacity. All references to a Member in this Agreement shall apply to a Member in his individual capacity and to a Member as trustee of a Grantor Trust, where appropriate.

Section 8.    Options Arising From Proposed Transfers.

8.1    Notice of Intended Transfer.  Each Class A Voting Member shall promptly advise the Company and the Class A Voting Members in writing of the existence of all serious negotiations with any Person for the Transfer of any Class A Units held by such Class A Voting Member. In the event any Member desires to Transfer, or determines that all or a portion of his Class A Units should be Transferred, pursuant to a Bona Fide Offer, that Member then becomes

Operating Agreement of Renewal Care Partners LLC

a Transferring Member and shall notify the Company and the other Members of that fact in a writing stating (i) his intention to make such Transfer, (ii) the Class A Units intended to be Transferred, (iii) the identity of the Person making the Bona Fide Offer and (iv) a copy of the Bona Fide Offer.  Such written notice is referred to herein as a "Notice of Bona Fide Offer".

8.2    Member Option.

(a)    For a period of twenty (20) days from the later of (i) the date of delivery to the Company of a Notice of Bona Fide Offer (hereinafter the "Notice Date") and (ii) the date of determination of the Fair Market Value of the Class A Units subject to such Notice of Bona Fide Offer pursuant to Section 8.1 hereof, the Remaining Members shall have and are hereby granted the right, privilege and option to elect to purchase all or a portion of the Class A Units owned by the Transferring Member as of the Notice Date. The purchase price of any Class A Units acquired by the exercise of an option granted hereunder shall be the Fair Market Value of such Class A Units and shall be payable in such amounts at such times and pursuant to such other terms and conditions as provided in Section 14.2 hereof. Each Remaining Member shall have the initial right to purchase that portion of the Class A Units of the Transferring Member equal to the ratio which the Class A Units owned by such Member on the Notice Date bears to the total number of Class A Units owned by all Remaining Members on the Notice Date. A Remaining Member may exercise the option granted in this Section 8.2 by providing written notice to the Transferring Member, the Company and the Remaining Members within the period described in this Section 8.2 containing a statement of such Remaining Member's election to exercise or not exercise his option hereunder and the amount of Class A Units, if any, which he elects to acquire. Failure to provide a timely written election shall constitute the election of the Remaining Member not to exercise his option.

(b)    In the event that one (1) or more of the Remaining Members does not exercise fully his initial right hereunder, the Transferring Member shall notify in writing all other Remaining Members and the Company of that fact within five (5) days after the expiration of the initial Remaining Member option period specified in Section 8.2(a). Each Remaining Member who has fully exercised his initial right hereunder shall thereafter have a secondary right to purchase all of the Class A Units of the Transferring Member which the Remaining Members have not theretofore elected to purchase under this Agreement in the ratio which such Remaining Member's existing number of Class A Voting Units owned on the Notice Date (exclusive of Class A Voting Units acquired by reason of the exercise of his initial or other rights hereunder), bears to the total number of Class A Voting Units owned on the Notice Date by all other Remaining Members who have fully exercised all initial and secondary rights hereunder (exclusive of Class A Voting Units acquired by reason of the exercise of their initial or other rights hereunder). Such secondary right may be exercised by providing written notice to the Transferring Member, the Company and the Remaining Members who have fully exercised all initial and secondary rights hereunder in the manner provided above within ten (10) days after delivery of notice to such Remaining Member of the existence of Class A Units subject to his secondary rights hereunder. The purchase price and terms of the secondary right shall be identical to those described in Section 14.2. The secondary right provided hereunder shall be renewed in the same manner until all of the Transferring Member's Class A

Operating Agreement of Renewal Care Partners LLC

Units have been purchased or until no Remaining Member desires to purchase any of the Class A Units of the Transferring Member which the Remaining Members have not theretofore elected to purchase under this Agreement.

8.3    Company's Option.  In the event the Remaining members do not fully exercise their rights pursuant to Section 8.2 to purchase all of the Class A Units owned by the Transferring Member as of the Notice Date, the Transferring Member shall provide the Company with written notice of that fact within ten (10) days after the expiration of the last option period provided under Section 8.2. The Company shall have and is hereby granted the right, privilege and option to elect to purchase all or some of the remaining Class A Units owned by the Transferring Member; provided, that the Company's option under this Section 8.3 must be approved by Remaining Members holding a majority of the Class A Voting Units (exclusive of any Class A Voting Units held by the Transferring Member). The purchase price of any Class A Units acquired by the exercise of such option shall be the Fair Market Value of such Class A Units and shall be payable in such amounts at such times and pursuant to such other terms and conditions as provided in Section 14.2. The option of the Company hereunder may be exercised by the Company providing written notice to the Transferring Member of its acceptance or rejection of such option and the number of Units it elects to acquire within twenty (20) days of the receipt of notice by the Company from the Transferring Member of its acceptance or rejection of such option and the number of Class A Units it elects to acquire within twenty (20) days of the receipt of notice by the Company from the Transferring Member required by this Section 8.3. Failure by the Company to provide timely response shall constitute the election of the Company not to exercise its option hereunder.

8.4    Right to Transfer.  In the event that the Remaining Members and the Company do not elect to acquire at least that number of Class A Units of the Transferring Member described in the Notice of Bona Fide Offer, the Transferring Member shall have the right, for a period of ninety (90) days from the expiration of the option period provided in Section 8.3, to Transfer that number of Class A Units (less any Class A Units purchased by the Remaining Members or the Company pursuant to Sections 8.2 or 8.3) identified in the Notice of Bona Fide Offer to the Person identified in, and on the exact same terms and conditions as specified in, the Notice of Bona Fide Offer. Such Transfer shall not be made on terms and conditions other than those set forth in the Notice of Bona Fide Offer, no matter how slight any such variance may be. If the Transferring Member's Class A Units are not so transferred within said ninety (90) day period, said Class A Units shall thereafter remain subject to all the provisions of this Agreement.

8.5    Obligations of Transferees.  All transferees of Class A Units transferred in accordance with Section 7.3 or this Section 8 or otherwise shall take said Class A Units subject to, and entitled to the benefits of, all of the terms, conditions, restrictions and agreements contained in this Agreement.  As a condition precedent to the validity and completion of any Permitted Transfer or other proposed Transfer of Class A Units, the transferee shall be required to execute a counterpart of this Agreement and such other documents, agreements, or contracts as may be required by the Company upon consultation with its legal counsel including, but not limited to, any member control agreement then in effect, or any other agreement or agreements as are deemed necessary by the Company to transfer all of the obligations and rights of the Transferring Member in the Class A Units to the transferee of such Class A Units. Any proposed

Operating Agreement of Renewal Care Partners LLC

Transfer or Permitted Transfer in which a proposed transferee refuses to comply with the provisions of this Section 10.5 shall be null and void ab initio.

> Section 9.    Additional Events Giving Rise to Options.  Upon the occurrence of any of the following events:

9.1    A Member becomes Financially Impaired;

9.2    A Member engages in Competition and fails to fully cease all activity consisting of Competition within twenty (20) days of delivery of written notice by the Company or the other Members to that Member asserting the occurrence of such Competition;

9.3    A Member's employment by the Company is terminated other than because of the Member's Retirement;

9.4    A Member's employment by the Company is terminated due to the Member's Retirement.

9.5    Any act occurs or condition exists which would constitute a Transfer of any Units if the restrictions upon Transfers set forth in this Agreement did not exist and which act or condition does not constitute a Permitted Transfer or a Transfer authorized or permitted pursuant to and completed in full compliance with Section 8;

then the Member to whom such event applies shall be deemed a Transferring Member and the Remaining Members and the Company shall have, and are hereby granted, the right, privilege and option to acquire all of the Class A Units owned by the Transferring Member immediately prior to the occurrence of such event and any additional Class A Units acquired by the Transferring Member subsequent to the occurrence of such an event but prior to the commencement of the initial Remaining Member option period described in Section 8.2 with respect thereto.

The options granted in this Section 9 may be exercised in accordance with the provisions of Sections 8.2 and 8.3.  The Company shall provide written notice to all Class A Members promptly after any manager or governor of the Company, other than the Transferring Member, first has actual knowledge that any event described in this Section 9 has occurred; the date upon which the Company delivers such notice shall be deemed to be the Notice Date under Section 8.2 with respect to such event.  The purchase price of the Class A Units subject to the option contained in this Section 9 shall be their Fair Market Value.  The purchase price shall be payable in such amounts and at such times as provided in Section 14.  In the event the Company and the Remaining Members do not elect to purchase all of the Class A Units subject to the options provided in this Section 9, the Transferring Member shall not be required to sell his Class A Units hereunder; the provisions of this Agreement shall continue to apply to any Units retained by such Transferring Member.

> Section 10.    Additional Events Giving Rise to Mandatory Purchase.  Upon the occurrence of any of the following events:

10.1    A Member dies; or

Operating Agreement of Renewal Care Partners LLC

    10.2    A Member becomes Disabled;

then the Member to whom such event applies shall be deemed a Transferring Member and the Company (or the Remaining Members, if the Remaining Members unanimously agree to personally purchase the Transferring Members) must purchase, and the Transferring Member must sell, all of the Class A Units owned by the Transferring Member immediately prior to the occurrence of such event and any additional Class A Units acquired by the Transferring Member subsequent to the occurrence of such an event.

The purchase required in this Section 10 will be conducted in accordance with the provisions of Sections 8.2 and 8.3. The Company shall provide written notice to all Class A Members promptly after any manager or governor of the Company, other than the Transferring Member, first has actual knowledge that any event described in this Section 10 has occurred; the date upon which the Company delivers such notice shall be deemed to be the Notice Date under Section 8.2 with respect to such event. The purchase price of the Class A Units subject to the mandatory purchase contained in this Section 9 shall be their Fair Market Value and shall be payable in such amounts and at such times as provided in Section 14. In the event the Company and the Remaining Members do not elect to purchase all of the Class A Units subject to the options provided in this Section 10, the Transferring Member shall not be required to sell his Units hereunder; the provisions of this Agreement shall continue to apply to any Units retained by such Transferring Member.

    Section 11.    <u>Purchase Option Upon Divorce</u>.  If either:

    11.1    the marriage of a Member (a "Divorced Member") is dissolved (either by court order or consent of the parties), or

    11.2    a court issues a decree or order that transfers, confirms or awards part or all of the Divorced Member's Class A Units to the Divorced Member's former spouse,

the former spouse of the Divorced Member (the "Former Spouse") is deemed to have offered his or her Class A Units to the Divorced Member for purchase on the earliest of the date of the parties' consent to the marital dissolution, the court order of marital dissolution, or the effective date of settlement of the marital estate or the court-ordered transfer of the Divorced Member's Class A Units to the Former Spouse (any of which referred to hereinafter as a "Divorce"), for the Fair Market Value of the Class A Units and payable in the manner set forth in Section 14. If the Divorced Member does not elect to make such purchase within ninety (90) days of the Divorce, the Former Spouse is deemed to have offered his or her Class A Units to the Company for purchase, for the Fair Market Value of the Class A Units and payable in the manner set forth in Section 14. The Divorced Member must send notice to the Company, in writing, that the Former Spouse owns or retains Class A Units in the Company within ninety (90) days of the date of the Divorce. The notice must state the name and address of the Divorced Member, the name and address of the Former Spouse, a description and amount of Class A Units awarded or transferred to the Former Spouse and the date of the Divorce. If no notice is received by the Company from the Divorced Member, an offer to the Company is deemed to have occurred when the Company receives actual written or oral notice of the Divorce. The Company will then have the option, but not the obligation, to purchase all or less than all of the Class A Units owned by the Former

Operating Agreement of Renewal Care Partners LLC

Spouse for the Fair Market Value of the Class A Units and payable in the manner set forth in Section 14. If the Former Spouse retains any of the Divorced Spouse's Class A Units, the Former Spouse must agree to be bound by the terms of this Agreement as stated in Section 8.5. If the Former Spouse does not agree to be bound by the terms of this Agreement as stated in Section 8.5, the Former Spouse will not become a Member of the Company but will be considered an assignee of the Divorced Spouse's Class A Units retained by the Former Spouse.

Each Member agrees to give notice to the Company of a pending Divorce. In the event of the failure of the Divorced Member or a Former Spouse to give notice to the Company of a Divorce under this Section 11, the period during which the Company may exercise its option to redeem a Former Spouse's Class A Units will be increased by the amount of time which has passed until such notice is given.

Section 12.    Reciprocal Purchase Rights. Each of the Members shall have the right at any time to offer to purchase, all, but not less than all, of the Interest held by any other Member. Such purchase offer shall set forth the precise terms of any such purchase, including the purchase price, the date of the closing of the transaction, and any other applicable terms or conditions. The Member who receives the offer (the "Offeree") shall notify the Member making the purchase offer (the "Offeror"), in writing, within thirty (30) days after receipt of the purchase offer that either (a) the Offeree accepts the offer, or (b) the Offeree will purchase the Interest of the Offeror upon the same terms and conditions as were specified in the Offeror's offer to purchase, subject only to adjustment reflecting any difference in the amount of such Offeror's Interest.

Failure of the Offeree to so notify the Offeror within the thirty (30) day period that the Offeree either accepts the offer or will purchase the Interest of the Offeror shall be deemed to be the Offeree's acceptance of the offer. The reciprocal purchase provisions of this Section Section 12 shall be subject to any necessary third-party (i.e., lender or lessor) approval requirements. For the benefit of any Offeree or Offeror who sells his Interest pursuant to this Section, the Company shall use reasonable best efforts to obtain his release from direct or indirect liability relevant to Company obligations. If such a release reasonably satisfactory to the selling party cannot be obtained, the buying party shall provide the selling party an indemnification and hold harmless agreement with respect to such Company obligations in form reasonably satisfactory to the selling party no later than at the time of the closing of the purchase of the Interest.

Section 13.    Unit Valuations.

13.1    Annual Valuation. Contemporaneous with each annual meeting of the Members of the Company commencing in or at such other time as the Class A Voting Members may agree in writing, consideration shall be given to the Fair Market Value of the Units for the purposes of this Agreement. The determination or redetermination of such Fair Market Value shall be made by the unanimous consent of the Class A Voting Members in writing and shall be reflected on a Redetermination of Value Certificate in the form identical to that attached hereto as Exhibit B which shall be executed by all of the Class A Voting Members. The Fair Market Value of the Units determined in the manner provided in this Section 13.1 shall be binding for the purposes of this Agreement except to the extent set forth in Section 8.2.

13.2    Formula.

(a)    If there shall not have been a redetermination of the Fair Market Value of the Units pursuant to Section 13.1 within thirteen (13) months prior to a Valuation Date, the Fair Market Value of the Units to be sold pursuant to the obligation to purchase or the exercise of an option to purchase Units as a result of the event to which the Valuation Date relates shall be determined pursuant to subsections 13.2(b) through (g) below.

(b)    The Fair Market Value shall be determined by unanimous agreement of the Transferring Member or his estate, and the Purchaser(s). In the event the Transferring Member and the Purchaser(s) are unable to agree upon the Fair Market Value of the Units within twenty (20) days of the Notice Date, the Company shall on that twentieth day and at its sole expense, appoint a qualified independent appraiser on behalf of the Purchaser(s) to determine the Fair Market Value of the Units as of the Valuation Date (the "First Appraisal") for the purposes of the Transfer between the Transferring Members and the Purchaser(s). Said appraisal shall be completed within thirty (30) days of the appointment of the appraiser. The Company shall provide the report of such independent appraiser to the Transferring Member and the Purchaser(s).

(c)    In the event the Transferring Member does not accept the results of the First Appraisal, the Transferring Member may, within fifteen (15) days after the date of delivery of the First Appraisal to him, notify the Purchaser(s) in writing of that fact. If such notice has been timely given, the Transferring Member may then select a qualified independent appraiser to conduct a separate appraisal (the "Second Appraisal") of the Fair Market Value of the Units as of the Valuation Date and submit that appraisal to the Board of Governors of the Company within forty-five (45) days after the delivery to the Transferring Member of the First Appraisal. The Transferring Member shall provide a copy of the report of such independent appraiser to the Company and each Remaining Member. If the Transferring Member does not cause a Second Appraisal to be timely made, the First Appraisal shall conclusively determine the Fair Market Value of the Units.

(d)    If the Second Appraisal is timely made and submitted and if, as between the First Appraisal and the Second Appraisal, the lower appraisal is not less than eighty percent (80%) of the higher appraisal, the Fair Market Value of the Units shall be the Fair Market Value determined in the First Appraisal. If the lower appraisal is less than eighty percent (80%) of the higher appraisal, the appraisers who submitted the First and Second Appraisals shall then mutually select a third qualified independent appraiser to make an appraisal of the Fair Market Value of the Units as of the Valuation Date (the "Third Appraisal"). In the event a Third Appraisal is required and the First and Second Appraisers cannot mutually agree on a selection of a qualified third appraiser within ten (10) days after the submission of the Second Appraisal, a third appraiser shall be chosen by the Chief Judge of the Fourth Judicial District of the State of Minnesota upon the request of the Board of Governors of the Company, the Transferring Member or either of the two appraisers.

Operating Agreement of Renewal Care Partners LLC

(e)    The Third Appraisal shall be completed within thirty (30) days after the selection of the third appraiser, and the Fair Market Value set forth in the Third Appraisal shall be averaged with either of the First or Second Appraisals, whichever of those two appraisal's value is closest to the appraised value set forth in the Third Appraisal. The value so determined shall be the Fair Market Value for the purposes hereof and shall be binding on the parties.

(f)    Except as provided in Section 12.2(b), the costs of an appraisal shall be borne by the party who ordered such appraisal. If a Third Appraisal is used to determine the Fair Market Value, the cost of such Third Appraisal shall be paid by the party whose appraisal is not used in the determination of the Fair Market Value.

(g)    All appraisers selected to make an appraisal shall be qualified by training and experience to competently appraise the business and assets of the Company. In determining Fair Market Value, all appraisers shall be instructed to appraise the market value of the assets of the Company (including intangible assets) and reduce therefrom all liabilities of the Company to determine the total Fair Market Value of all of the issued and outstanding Units. Each appraiser shall be instructed not to give any consideration to the fact that the Transferring Member may own more or less than a majority of the outstanding Units or that such Units is not readily transferable.

13.3    MEMBERSHIP INTEREST VALUATION EXPECTATIONS. EACH MEMBER ACKNOWLEDGES THAT, ALTHOUGH THERE ARE MANY POSSIBLE METHODS OF DETERMINING THE FAIR MARKET VALUE OF THE COMPANY'S MEMBERSHIP INTERESTS, ALL OF THE MEMBERS HAVE ENTERED INTO THIS AGREEMENT IN RELIANCE UPON THE EXPECTATION AND UNDERSTANDING THAT THE METHOD(S) CONTAINED IN THIS AGREEMENT FOR DETERMINING THE FAIR MARKET VALUE OF THE COMPANY'S MEMBERSHIP INTERESTS WILL BE APPLIED UNDER THE CIRCUMSTANCES AND IN ACCORDANCE WITH THE TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT. ACCORDINGLY, IT IS THE INTENTION AND EXPECTATION OF ALL THE MEMBERS THAT, IN SITUATIONS IN WHICH THIS AGREEMENT IS APPLICABLE, THE COURTS INTERPRET AND APPLY THIS AGREEMENT STRICTLY IN ACCORDANCE WITH ITS TERMS AND CONDITIONS.

Section 14.    Payment for Units.

14.1    Closing Date. In the event of the sale of Units of a Transferring Member pursuant hereto, the Closing of the transaction shall occur at a time of day and place mutually agreeable to the Transferring Member, his representative and the Purchasers on a date not later than thirty (30) days subsequent to (a) the expiration of the last option period applicable to any of the Units; (b) in the event of a purchase upon the death of a Member, and with respect to each Purchaser entitled to receive proceeds of any life insurance on the deceased Member, the date of receipt by that Purchaser of those proceeds; or (c) the final determination of Fair Market Value under Section 13.2.

Operating Agreement of Renewal Care Partners LLC

14.2    Payment Terms.  The purchase price of any Units acquired in a sale pursuant to this Agreement shall be paid in cash or certified funds.  Thirty percent (30%) of the purchase price shall be paid at Closing, or, in the event of the death of Member, each Purchaser who receives proceeds of life insurance on the death of Member shall pay at Closing the amount (not to exceed the total purchase price) of the life insurance proceeds received by that Purchaser.  The remaining principal balance of the purchase price shall be paid in five (5) equal consecutive annual installments commencing on the first (1st) anniversary of the Closing Date and continuing on each and every anniversary date in the four (4) succeeding years, together with interest accrued on the unpaid balance at the Applicable Rate.

14.3    Promissory Note.  As evidence of any installment payment obligations incurred by the payment terms of Section 14.2, each Purchaser shall issue to the Transferring Member on the Closing Date a Promissory Note or notes providing for payment in the required manner and in substantially the same form and substance as that attached hereto as Exhibit C.

14.4    Escrow and Pledge Agreement; Security Agreement.

(a)    In the event a Purchaser is a Member, and if and only if a certificate representing the Transferring Member's Units has previously been issued by the Company, contemporaneous with the execution and delivery of the Promissory Note, the Transferring Member and Purchaser shall execute and deliver an Escrow and Pledge Agreement in a form substantially identical to the Escrow and Pledge Agreement attached hereto as Exhibit D and the Transferring Member shall surrender the certificates representing the transferred Units, together with a duly executed assignment separate from certificate, to the escrow agent designated in the Pledge Agreement. The person to perform the duties of escrow agent pursuant to the Escrow and Pledge Agreement shall be mutually agreed upon by the respective parties. Notwithstanding the Escrow and Pledge Agreement, the Purchaser shall be entitled to exercise all rights of ownership with respect to the pledged Units, including the right to vote Class A Voting Units and receive cash dividends.

(b)    In the event a Purchaser is a Member, and if and only if a certificate representing the Transferring Member's Units has not previously been issued by the Company, contemporaneous with the execution and delivery of the Promissory Note, the Transferring Member and Purchaser shall execute and deliver a Security Agreement in a form substantially identical to the Security Agreement attached hereto as Exhibit "F," except that the "Collateral" in the Security Agreement shall be limited to only the transferred Units.

(c)    In the event a Purchaser is the Company, contemporaneous with the execution and delivery of the Promissory Note, the Transferring Member and Purchaser shall execute a Security Agreement in a form substantially identical to the Security Agreement attached hereto as Exhibit E and the Transferring Member shall surrender certificates representing the transferred Units, if any, together with a duly executed assignment separate from certificate, to the Company for cancellation.

Section 15.    Dissolution and Winding Up.

Operating Agreement of Renewal Care Partners LLC

15.1   Dissolution.  The Company shall be dissolved and its affairs wound up upon the first to occur of the following:

(a)     The vote of two-thirds (2/3) of the Voting Interests;

(b)     Sale of all or substantially all of the assets of the Company and cessation of its business in the ordinary course; or

(c)     Entry of a decree of judicial dissolution under the LLC Law.

15.2   Liquidation.

(a)     Upon the occurrence of an event of dissolution as set forth in Section 15.1 of this Agreement, the Company shall cease to engage in any further business, except to the extent necessary to perform existing obligations, and shall wind up its affairs and, if necessary to pay or establish reserves for all debts and contingent or unforeseen liabilities of the Company, liquidate its assets. The Managers shall have the sole authority and control over the winding up and liquidation of the Company's business and affairs and shall diligently pursue the winding up and liquidation of the Company, but a reasonable time shall be allowed for any necessary, orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to minimize the normal losses attendant upon such a liquidation.

(b)     During the course of liquidation, the Members shall continue to share profits and losses as provided in Section 5 of this Agreement.

15.3   Liabilities.  Any liquidation shall continue until the Company's affairs are in such condition that there can be a final accounting, showing that all fixed or liquidated obligations and liabilities of the Company are satisfied or can be adequately provided for under this Agreement. The assumption or guarantee in good faith by one or more financially responsible persons shall be deemed to be an adequate means of providing for such obligations and liabilities. When the Managers have determined that there can be a final accounting, the Managers shall establish a date for the distribution of the assets of the Company, including any proceeds of liquidation (the "Distribution Date"). The assets of the Company, including any net proceeds of liquidation, shall be distributed to the Members as provided in Section 15.5 hereof not later than the Distribution Date.

15.4   Settling of Accounts.  Subject to any applicable provisions of the LLC Law, upon the dissolution and any liquidation of the Company, the cash of the Company and any proceeds of liquidation shall be applied as follows: (i) first, to pay all expenses of liquidation and winding up; (ii) second, to pay all debts, obligations and liabilities of the Company in the order of priority as provided by law, other than on account of Members' contributions; and (iii) third, to establish reasonable reserves for any remaining contingent or unforeseen liabilities of the Company not otherwise provided for, which reserves shall be maintained by the Managers on behalf of the Company in a regular interest-bearing trust account for a reasonable period of time as determined by the Managers. If any excess funds remain in such reserve at the end of such reasonable time, then such remaining funds shall be distributed by the Company to the Members pursuant to Section 15.5 hereof.

Operating Agreement of Renewal Care Partners LLC

15.5    Distribution of Assets of the Company.  Upon dissolution of the Company but not later than the Distribution Date, the assets of the Company, including any net proceeds of liquidation, shall be distributed to the Members (a) in proportion to the positive balances of their Capital Accounts, and (b) to the Members in accordance with their Percentage Interests.

15.6    Cancellation of Articles of Organization of the Company.  Following the dissolution and the commencement of winding up of the Company, the Managers shall cause Articles of Dissolution to be prepared, executed and filed in accordance with the LLC Law. This Agreement shall remain in full force and effect during the period of winding up and until the Articles of Dissolution are filed under the LLC Law.

Section 16.    Liability, Exculpation and Indemnification.

16.1    No Liability for Company Debts.  To the fullest extent permitted by law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no current or former Member or Manager, officer or employee of the Company (each, a "Covered Person") shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

16.2    Exculpation.  To the fullest extent permitted by law, no Covered Person shall be liable to the Company or any Member for any loss or liability arising out of any act or omission of such Covered Person in connection with the Company so long as (a) such act or omission was not in breach of this Agreement, (b) in the case of any act or omission of a Manager, such Manager's conduct was consistent with Section 4.7, and was not in bad faith, did not involve intentional misconduct or a knowing violation of law and (c) in the case of any act or omission by any Covered Person, such acts or omissions were not in bad faith or the result of active and deliberate dishonesty that was material to the cause of action and the Covered Person did not gain in fact a financial profit or other advantage to which such Covered Person was not legally entitled.

16.3    Indemnification.  The Company shall indemnify and hold harmless each Covered Person from and against any claim, loss, expense, liability, action or damage, including reasonable costs and expenses of litigation and appeal, including reasonable fees and expenses of attorneys engaged by the Covered Person (collectively, a "Claim"), related to or arising out of the Company's business or affairs, provided that such Claim does not arise out of (a) a breach of this Agreement by the Covered Person or (b) a matter for which the Covered Person could be liable to the Company under Section 16.2.

16.4    Advancement of Expenses.  The Company shall pay the expenses (including reasonable fees and expenses of attorneys engaged by the Covered Person) incurred by a Covered Person in defending any Claim, as such expenses are incurred by such Covered Person and in advance of the final disposition of the matter, provided that such Covered Person undertakes to repay the expenses if it is determined by agreement between such Covered Person and the Company or by a final judgment of a court of competent jurisdiction that such Covered Person is not entitled to be indemnified pursuant to Section 16.3.

Operating Agreement of Renewal Care Partners LLC

16.5    Continuing Rights. No amendment or modification of, or supplement to, this Section 16 shall adversely affect any right or protection of any Covered Person existing at or prior to the time of such amendment, modification or supplement. The rights provided in this Section 16 shall inure to the benefit of the heirs, executors and administrators of the Covered Persons and to the officers, directors, shareholders, partners, members, managers and other controlling Persons of the Covered Persons. The indemnification provided for herein shall not be deemed exclusive of any other rights to indemnification.

Section 17.    Records and Accounting; Fiscal Affairs.

17.1    Fiscal Year. The Company's fiscal year shall end on December 31 unless required to the contrary under the Code.

17.2    Bank Accounts. All of the Company's funds shall be deposited in bank accounts designated by the Managers. Withdrawals from any such bank account shall be made upon the signature of a Manager and shall be made only for the purposes of the Company that have been approved by the Managers.

17.3    Access to Records and Accounting. The Managers shall, at the Company's cost and expense, maintain full and accurate books and records, in accordance with the Company's accounting policies consistently applied, at the principal place of business of the Company or such other place as the Managers may determine. The books and records shall show all receipts and expenditures, assets and liabilities, Net Income or Net Loss, and all other records necessary for recording the Company's business and affairs, including those sufficient to record the allocations and distributions provided for in this Agreement. The books and records shall, upon reasonable prior notice to the Company, be open for inspection and copying by any Member or such Member's duly authorized representatives during regular business hours at such principal place of business. Any expense for any inspection or copying shall be borne by the Member causing such inspection or copying to be conducted. Any information obtained by a Member with respect to the affairs of the Company shall be kept strictly confidential, except as may be required by law. Each Member shall also be entitled:

        (a)    To obtain from the Managers upon reasonable demand for any purpose such information reasonably related to the Member's Interest in the Company;

        (b)    To have true and full information regarding the state of the business and financial condition and any other related information regarding the affairs of the Company;

        (c)    To have a formal accounting of the Company's affairs whenever circumstances render an accounting just and reasonable;

        (d)    To obtain from the Company a Schedule K-1 to IRS Form 1065 and any related schedules in a timely manner; and

        (e)    To obtain from the Managers copies of statements of accounts for the funds of the Company.

17.4    <u>Tax Status</u>. Each Member hereby recognizes that the Company will be treated as a partnership for federal, state and local tax purposes. No Member shall take any action that would cause the Company not to be treated as a partnership for federal, state and local tax purposes. Each Member agrees to report, on such Member's own income tax returns for each year, each item of income, gain, loss, deduction and credit as reported by the Company to such Member on Schedule K-1 (*or other similar tax report*) issued by the Company to such Member for such year. Except as otherwise required by law, no Member shall take any reporting position that is inconsistent in any respect with any tax reporting position taken by the Company and, in the event of a breach by such Member of the provisions of this Section 11.4, such Member shall be liable to the Company and the Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

17.5    <u>Tax Returns; Elections</u>.

(a)    The Managers shall use all reasonable efforts to cause the Company's accountants to prepare and make timely filings of all tax returns and statements that must be filed on behalf of the Company with any taxing authority, and shall promptly provide a copy of such returns and statements to each Member. Copies of such returns shall be kept at the Company's principal place of business or at such other place as the Managers shall determine and shall be available for inspection by the Members or their duly authorized representatives during regular business hours.

(b)    The Company may, but is not required to, make an election for federal income tax purposes to the extent permitted by applicable law and regulations, as follows:

(i)    In case of a Transfer of all or part of any Interest effected in accordance with the terms of this Agreement, the Company may elect in a timely manner under Code § 754 and the corresponding provisions of applicable state and local tax laws to adjust the basis of the assets of the Company under Code § 734 and § 743.

(ii)    All other elections required as permitted to be made by the Company shall be made in such manner as Managers, in consultation with the Company's attorneys or accountants, determine to be most favorable to the Members.

(iii)    No Member shall take any action or refuse to take any action that would cause the Company to forfeit the benefits of any tax election previously made or agreed to be made by the Company.

17.6    <u>Tax Matters Partner</u>. Pursuant to Code §6231(a)(7)(A), if applicable to the Company, the Treasurer is hereby designated as the "<u>Tax Matters Partner</u>" of the Company for all purposes of the Code and for the corresponding provision of any state or local statute. Each of the Members hereby consents to such designation and agrees to take any such further action as may be required by Treasury Regulations or otherwise to effectuate such designation. The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by any tax authorities, including

resulting judicial and administrative proceedings, and to expend Company funds for professional services and costs associated therewith. The decisions of the Tax Matters Partner shall be final and binding as to all Members except to the extent that any Member files a statement not to be bound by a settlement pursuant to Code § 6224(c)(3). The Tax Matters Partner shall furnish to the Members a copy of all notices or other written communications received by the Tax Matters Partner from the Internal Revenue Service or any state or local taxing authority (except such notices or communications as are sent directly to the Members) promptly after receipt of any such notice or written communication.

Section 18.    Other Matters.

18.1    Amendment. Except to the extent otherwise required by law, this Agreement may be amended in a written agreement executed by Members holding at least two-thirds (2/3) of the Voting Interests; provided, however, that no amendment shall:

(a)    increase the obligations of any Member to make Capital contributions or impose any other liabilities on any Member unless in each case such Member consents thereto;

(b)    change the allocation of Net Income or Net Loss for tax purposes or change the manner of computing distributions to any Member unless in each case, every Member adversely affected thereby consents thereto (it being understood that the issuance of new Interests to a new or existing Member in exchange for Capital Contributions without amending Section 5 or Section 6 will require only the consent of two-thirds (2/3) of the Voting Interests);

(c)    amend any provision hereof which requires the consent, action or approval of the Members of a specified Membership Percentage without the consent of such Members; or

(d)    amend this Section 18.1,

without the consent of all of the Members.

18.2    Notices. Except as specifically provided elsewhere in this Agreement, all notices, requests, consents or other communications to the Company, the Managers or any Member shall be in writing (which shall include an email or facsimile transmission) and shall be given: if to the Company or the Managers, to the address for the Company set forth in Section 2.4, and if to any Member, to the address for such Member set forth on Schedule A hereto. Any address may be changed by notice given by the Company or the Member whose address is being changed to the other parties by written notice. Each notice shall be given by hand, by first class mail, by a nationally recognized courier service or by facsimile or email transmission with a confirmation copy sent by first class mail or nationally recognized courier service.

18.3    Governing Law. This Agreement shall be interpreted and construed in accordance with the laws of the State of New York without regard to the conflict of law provisions contained therein.

Operating Agreement of Renewal Care Partners LLC

18.4   Interpretation. All pronouns and any variations thereof shall be deemed to refer to the singular or plural, masculine, feminine or neuter as the identity of the Person or Persons referred to may require. The captions of Sections of this Agreement have been inserted as a matter of convenience only and shall not control or affect the meaning or construction of any of the terms or provisions hereof. Unless otherwise specified, references in this Agreement to Articles or Sections refer to the Articles and Sections of this Agreement. "Include", "includes" and "including" shall be deemed to be followed by the words "without being limited to."

18.5   Severability. The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

18.6   Entire Agreement. This Agreement and the schedules and exhibits attached hereto constitute the entire agreement among the members with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, representations and understandings of the parties with respect to the Company.

18.7   Counterparts; Effective Date. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signature of any Member to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. This Agreement is dated and shall be effective among the Members as of the date first above written.

18.8   Binding Effect. This Agreement shall be binding upon, and shall inure to the benefit of, the Members and, subject to the limitations set forth in Section 7, their respective successors, heirs, executors, administrators, legal representatives and permitted assigns. Each Manager and each other Covered Person shall be entitled to rely upon, shall be a third party beneficiary of, and shall be entitled to enforce the provisions of this Agreement applicable to such Person.

18.9   Waiver. The failure of the Company or any Member to insist on strict performance of any obligation under this Agreement shall not be deemed a waiver or relinquishment of the rights of the Company or the Members to demand strict compliance in the future with respect to such covenant or obligation. No consent or waiver, express or implied, to or of any breach or default in the performance any obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance of the same or any other obligation under this Agreement.

18.10   Additional Remedies. The rights and remedies of the Members and the Company shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any Member aggrieved as against any other Member, for breach or threatened breach of any provision hereof, it being the intention of this Section to make clear the agreement of the Members that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

Operating Agreement of Renewal Care Partners LLC

18.11   <u>No Certification</u>.  No certification shall be issued evidencing a Member's Interest. Furthermore, Article 8 of the New York Uniform Commercial Code shall not apply to this Agreement or to any Interest.

18.12   <u>Jurisdiction and Consent to Service</u>.  Each Member:  (a) agrees that any suit, action or proceeding arising out of or relating to this Agreement shall be brought solely in the state or (to the extent they have subject matter jurisdiction) the federal courts situated in the State of New York; (b) consents to the exclusive jurisdiction of each such court in any suit, action or proceeding relating to or arising out of this Agreement; (c) waives any objection that such Member may have to the laying of venue in any such suit, action or proceeding in any such court; and (d) agrees that service of any court paper may be made in such manner as may be provided under applicable laws or court rules governing service of process.

18.13   <u>Acknowledgement</u>.  Each Member acknowledges that this Agreement has been prepared by the law firm of Fafinski Mark & Johnson, P.A. on behalf of its client, Renewal Care Partners LLC, and that each Member has been advised to seek independent counsel for this Agreement.  Each Member confirms that such Member has read and understands this Agreement and has consulted with counsel of such Member's own choosing or has knowingly and voluntarily declined to do so.

[Remainder of this page intentionally left blank]

Operating Agreement of Renewal Care Partners LLC

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the 25th day of February, 2014.

_____
Patrick O'Brien

_____
Joe Fisher

Operating Agreement of Renewal Care Partners LLC

## EXHIBIT A

| Name of Member | Contribution | Class A Units | Membership Percentage | Voting Interest |
|---|---|---|---|---|
| Patrick O'Brien | $50,000.00 | 10,000 | 50% | 50% |
| Joe Fisher | $50,000.00 | 10,000 | 50% | 50% |

Operating Agreement of Renewal Care Partners LLC

## EXHIBIT B

## REDETERMINATION OF VALUE CERTIFICATE OF RENEWAL CARE PARTNERS LLC

Date: _____

Aggregate Fair Market Value of Renewal Care    _____
Partners, LLC:

The undersigned, being all of the Members of Renewal Care Partners LLC and pursuant to that certain Member Control Agreement effective _____, _____, do hereby agree to the foregoing valuation as of the date indicated.

Renewal Care Partners LLC,
a New York limited liability company

By: _____
Its: _____

Operating Agreement of Renewal Care Partners LLC

# EXHIBIT C

## PROMISSORY NOTE

$ _____                                    _____, 20__

                                                New York, New York

    FOR VALUE RECEIVED, the undersigned promises to pay to the order of _____ ("Creditor") at _____, or at such other place as the holder hereof may designate from time to time, the principal sum of _____ ($_____) together with interest thereon from the date hereof at an annual rate of _____ percent ( ___%), compounded monthly.

    Interest accruing from the date hereof through _____ has been paid on the date hereof.  Principal and interest shall be payable monthly in equal installments of _____, ($_____) commencing on _____ and on the first day of each month thereafter through and including _____ at which time the entire principal balance and all accrued and unpaid interest thereon shall be finally due and payable.

    If the undersigned fails to make any payment hereunder when due, and such default shall have continued for a period of _____ days after notice thereof shall have been given by Creditor to the undersigned, or if there shall occur any Event of Default under and as defined in the [***Escrow and Pledge Agreement / Security Agreement] referred to below (as the result of any default thereunder which has not been cured within the cure period, if any, provided with respect thereto), the Creditor shall have the right by written notice to undersigned to declare that this Note shall be due and payable, and this Note shall thereupon be and become due and payable, together with interest accrued thereon.

    All or any part of the unpaid balance of this Note may be prepaid at any time without penalty.  All payments shall be applied first to accrued and unpaid interest due hereunder and the balance to principal.  Any partial prepayment shall not reduce the amount of any monthly installment due.

    This Note is issued in partial satisfaction of the undersigned's obligations arising under the Member Control Agreement between the parties dated _____ (the "Agreement").

    The obligations of the undersigned hereunder are secured pursuant to that [***Escrow and Pledge Agreement between the undersigned, Creditor, and the escrow agent of even date herewith (the "Escrow and Pledge Agreement") / Security Agreement between the undersigned, Creditor, and of even date herewith (the "Security Agreement")].

$_____                    _____

                               _____

## EXHIBIT D

## ESCROW AND PLEDGE AGREEMENT

THIS ESCROW AND PLEDGE AGREEMENT (this "Escrow Agreement") is entered into effective the _____ day of _____, 20__ (hereinafter the "Effective Date") by and between _____, a _____ (hereinafter "Pledgor"), _____ (hereinafter "Secured Party") and _____ (hereinafter "Escrow Agent").

### RECITALS:

A.    Secured Party and Pledgor are parties to that Member Control Agreement (the "Member Control Agreement ") of _____ (the "Company") dated _____ herewith pursuant to which Pledgor agreed to acquire from Secured Party certain membership interests in the Company (the "Units").

B.    As partial payment of the obligations due under that Member Control Agreement, Pledgor has issued to Secured Party its promissory note in the amount of _____ ($_____) of even date herewith (the "Note").

C.    In order to secure the obligations of payment and performance of Pledgor under the Note and this Agreement (collectively the "Secured Obligations"), Pledgor herein grants to Secured Party a security interest in the Units upon the terms and conditions set forth in this Agreement. Pledgor and Secured Party desire Escrow Agent to act as their escrow agent under the terms of this Agreement with respect to the pledge of the Units described herein.

### AGREEMENTS:

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants of the party hereto, the parties do hereby agree as follows:

Section 1.    Appointment of Escrow Agent and Acceptance.  Pledgor and Secured Party do hereby appoint and designate _____ as the escrow agent for the purposes set forth in this Agreement (the "Escrow Agent").  Escrow Agent hereby accepts that appointment and agrees to perform the obligations of Escrow Agent set forth in this Agreement.

Section 2.    Security Interest.  As security and payment for the performance by the Pledgor of the Secured Obligations, Pledgor does herby grant to Secured Party a security interest in the Units together with the proceeds thereof and any additional collateral which may be delivered to Escrow Agent in accordance with this Section 2.  Until the Secured Obligations are satisfied in full, if the Company shall distribute to its Members, by reason of their ownership of membership interests in the Company, any security or property, other than cash, then Pledgor shall distribute to Escrow Agent, to hold as additional collateral hereunder, the membership interests or the amount of any such other property to which Secured Party would have been entitled if he or she were the owner of the Units.  The Units and any substitutions, replacements and additions described above are collectively referred to herein as the "Collateral".

Section 3.   Deposit by Pledgor.  A certificate representing the Units (hereinafter the "Certificate") together with an assignment separate from certificate with respect to the Units duly endorsed to Secured Party by the Pledgor (the "Assignment") are hereby deposited by the Pledgor with Escrow Agent to be held as collateral security for the payment and performance of the Secured Obligations.  The Certificate and Assignment and any other Collateral delivered to Escrow Agent shall be held and disposed of by the Escrow Agent in accordance with the terms and provisions of this Agreement.

Section 4.   Representations, Warranties and Covenants of Pledgor.  Pledgor hereby represents, warrants and covenants to Secured Party that until the Secured Obligations are satisfied in full:

4.1   Good Title, Further Assurance.  The Pledgor has and will have at all times during the term hereof good title to the Collateral free and clear of all security interests, liens and encumbrances except the security interest granted herein.  Pledgor shall execute any financing statement or take any other action requested by Secured Party which Secured Party determines is necessary and proper in order to perfect her security in the Collateral.  No failure on the part of Secured Party or Escrow Agent to require any current perfection of the security interest granted herein shall be deemed a waiver of Secured Party's rights to require the perfection of such security interest in the future.

4.2   Sale or Encumbrance of Collateral.  Pledgor shall not sell, transfer, lease, grant a security interest in, or otherwise dispose of any of the Collateral without the prior written consent of Secured Party.

4.3   Performance of Agreement.  Pledgor shall pay each installment of principal and interest due under the note as and when the same shall become due and shall perform and observe all covenants, agreements and provisions contained in the Note and this Agreement.

Section 5.   Events of Default.  Any of the following shall constitute an "Event of Default" under this Agreement:

5.1   Breach by Pledgor of any covenant, representation, warranty or agreement contained in the Note or this Agreement where such breach is not completely cured within ten (10) days, in the case of payment default, or within thirty (30) days in all other cases, after delivery of Pledgor of written notice from Secured Party identifying any such default.

5.2   Any statement, representation or warranty of Pledgor to Secured Party made in this Agreement shall prove to have been incorrect or misleading in any material respect when made.

5.3   Pledgor becomes insolvent or makes an assignment for the benefit of creditors, applies for or consents to the application, or suffers the appointment of, any receiver, trustee or similar officer, or initiates or has initiated against it, any act, process or proceeding under insolvency, bankruptcy, dissolution, liquidation or similar law which shall remain unstayed for a period of thirty (30) days.

Section 6.     <u>Remedies</u>.  Upon the occurrence of an Event of Default, at any time thereafter until such Event of Default is fully cured, Secured Party may deliver a notice of default to Pledgor and Escrow Agent simultaneously stating that Pledgor is in default under the terms of this Agreement and the Note.  The Escrow Agent shall, not less than five (5) nor more than ten (10) days after receipt of such written notice, deliver the Certificate and Assignment together with any other Collateral or documentation delivered to Escrow Agent pursuant to this Agreement to the Secured Party.  Written notice of that delivery shall be sent by Escrow Agent to Pledgor.  The Secured Party shall have all rights and remedies available to him or her under applicable law with respect to any such Event of Default.  Nothing contained herein shall be deemed to limit or restrict any other remedy available to Secured Party.

Section 7.     <u>Rights of Ownership Prior to Default</u>.  So long as the Collateral is held by the Escrow Agent and until such time as Secured Party may become entitled to possession of the Collateral under this Agreement, Secured Party may not exercise any voting rights or other rights with respect to the Collateral or receive any cash distributions associated therewith.

Section 8.     <u>Satisfaction of the Secured Obligations; Return of Collateral</u>.  Upon satisfaction in full of the Secured Obligations, Pledgor shall deliver written notice thereof to Secured Party and the Escrow Agent.  The Escrow Agent shall, not less than five (5) nor more than ten (10) days after the receipt of such written notice, deliver the Certificate and Assignment, together with any other Collateral or documentation delivered to Escrow Agent pursuant to this Agreement to the Pledgor.  Written notification of that delivery shall be sent by Escrow Agent to Secured Party.

Section 9.     <u>Duties and Obligations of Escrow Agent</u>.

9.1     The Escrow Agent may exclusively rely upon and shall be protected in acting upon any statement, certificate, notice, request, consent, order or other document believed by it to be genuine and to have been signed or presented by the proper party or parties hereunder.  The Escrow Agent shall be under no duty or obligation to ascertain the accuracy or correctness of any mater set forth in any notice or affidavit received by it pursuant to the terms of this Agreement and shall be entitled to fully rely on any such notice or affidavit alone, without further documentation or inquiry and to release or deliver the Collateral or any document held by it in accordance with such notice or affidavit in the time period provided in this Agreement.  The release and delivery of the Collateral or any other documents evidencing the Collateral in accordance with the terms of this Agreement shall constitute full and complete discharge of all obligations of Escrow Agent hereunder.

9.2     The Escrow Agent shall be under no obligation to institute or defend any action, suit or proceeding in connection with this Agreement unless first indemnified to its satisfaction.  Escrow Agent may retain counsel in respect of any questions arising under this Agreement and the Escrow Agent shall not be liable for any action taken or omitted in good faith advice of such counsel.

9.3     All securities held by Escrow Agent pursuant to this Agreement shall constitute trust property for the purposes for which are held and the Escrow Agent shall not be liable for any interest thereon.

Operating Agreement of Renewal Care Partners LLC

Section 10.    Miscellaneous Provisions.

10.1    Incorporation of Recitals.  The parties hereto acknowledge that the above-stated recitals are true and correct and are hereby incorporated by reference.  The parties hereto have entered into this Agreement in reliance upon the recitals as hereinbefore set forth together with the representations, warranties and other terms and provisions of this Agreement.

10.2    Entire Agreement.  This Agreement embodies the entire understanding between the parties.

10.3    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their assigns, executors, heirs and successors provided that no party shall assign any right or obligation hereunder, in whole or in part, without the prior written consent of the other parties hereto, and any attempt to do so shall be void.

10.4    Amendment, Modification or Waiver.  No amendment, modification or waiver of any condition, provision or term of this Agreement shall be valid or of any effect unless made in writing, signed by the party or parties to be bound or his, her or its duly authorized representative and specifying  with particularity the nature and extent of such amendment, modification or waiver.  Any waiver by any party of any default or another party shall not affect or impair any right arising from any subsequent default.  Nothing herein shall limit the remedies and rights of the parties hereto under and pursuant to this Agreement.

10.5    Notices.  Except as otherwise provided in this Agreement, all notices to be given under this Agreement shall be in writing and shall be deemed to have been duly given, if mailed, certified mail, postage prepaid, United States mail, to the party to be notified at its address set forth as follows:

If to Pledgor:

_____

_____

_____

If to Secured Party:

_____

_____

_____

If to Escrow Agent:

_____

_____

_____

Any party may change its address by giving notice in the aforesaid manner to the other party, and ten (10) days after giving such notice, such party's address shall be deemed to have been changed.

10.6     Captions, Headings or Titles and Reference to Gender.  All captions, headings or titles in the paragraphs or sections of this Agreement are inserted for convenience of reference only and shall not constitute a part of this Agreement nor operate as a limitation of the scope of the particular paragraphs or sections to which they apply.  As used herein, reference to any Article, Paragraph, Section, Subparagraph or Subsection shall be only with reference to an article, paragraph, section, subparagraph or subsection of this Agreement unless specifically indicated otherwise.  Where appropriate, the masculine gender may be read as the feminine gender or the neuter gender, the feminine gender may be read as the masculine gender or the neuter gender and the neuter gender may be read as the masculine gender or the feminine gender.

10.7     Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable under any applicable law or rule in any jurisdiction, such provision will be ineffective only to the extent of such invalidity, illegality or unenforceability in such jurisdiction without invalidating the remainder of this Agreement in such jurisdiction or any provision hereof in any other jurisdiction.

10.8     Specific Performance.  The parties hereto agree that the failure of any party to perform any obligation or duty which each has agreed to perform shall cause irreparable harm to the parties willing to perform the obligations and duties herein, which harm cannot be adequately compensated for by money damages.  It is further agreed by the parties hereto that an order of specific performance against a party or parties in default under the terms of this Agreement would be equitable and would not work a hardship on the defaulting party or parties.  Accordingly, in the event of a default by any party hereto, a non-defaulting party, in addition to whatever other remedies are available at law or in equity, shall have the right to compel specific performance by the defaulting party or parties of any obligation or duty herein.

10.9     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

Operating Agreement of Renewal Care Partners LLC

10.10  Governing Law; Venue; Consent to Jurisdiction.  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of New York.  Regardless of any present or future domicile of any party hereto, each party hereby submits to the jurisdiction and venue of the federal courts situated in the State of New York, for the purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby.  Each party hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the jurisdiction or venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and year first above written.

PLEDGOR:

_____

By: _____
Its: _____

SECURED PARTY:

_____

By: _____
Its: _____

ESCROW AGENT:

_____

_____

By: _____
Its: _____

Operating Agreement of Renewal Care Partners LLC

## EXHIBIT E

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made as of the ___ day of _____, 200__, between _____ (the "Secured Party"), and _____, a _____ doing business at _____ (the "Debtor").

WHEREAS, the Debtor has executed and delivered to the Secured Party a Promissory Note (the "Note") with a principal balance of _____ and No/100ths Dollars ($_____) (the "Principal Balance"), dated of even date herewith;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

Section 1.    The Security Interest.  in order to secure the due and punctual payment of the principal balance and all interest thereon due under the note (the principal balance and all other amounts hereinafter collectively referred to as the "Obligations"), the debtor hereby grants to the secured party a continuing security interest in the following property (hereinafter collectively referred to as the "Collateral"):

All equipment of the Debtor, together with accessions, accessories, attachments, fittings, increases, parts, repairs, returns renewals and substitutions of all or any part thereof, whether now existing or hereafter arising, and whether now owned or hereafter acquired;

All inventory of the Debtor, and all returns of such inventory, whether now existing or hereafter arising, and whether now owned or hereafter acquired;

All accounts including but not limited to all healthcare insurance receivables, instruments, chattel paper, investment property, letter-of-credit rights, letters of credit, other rights to payment, documents, deposit accounts, money, patents, patent applications, trademarks, trademark applications, copyrights, copyright applications, trade names, other names, software, payment intangibles, and other general intangibles of the Debtor, together with all good will related to the foregoing property and all rights, liens, security interests and other interests which the Debtor may at any time have by law or agreement against any account debtor, issuer or obligor obligated to make any such payment or against any of the property of such account debtor, issuer, or obligor, and all supporting obligations relating to the foregoing, whether now existing or hereafter arising, and whether now owned or hereafter acquired;

and all products and proceeds of the foregoing property, including without limitation all accounts, instruments, chattel paper, investment property, letter-of-credit rights, letters of credit, other rights to payment, documents, deposit accounts, money, insurance

Page 41 of 45

Operating Agreement of Renewal Care Partners LLC

proceeds and general intangibles related to the foregoing property, and all refunds of insurance premiums due or to become due under all insurance policies covering the foregoing property.

Section 2.    <u>Filing of Financing Statements</u>.  The Debtor will, at its expense, execute, deliver, file and record (in such manner and form as the Secured Party shall require), or permit the Secured Party to file and record, any UCC-1 financing statements, any carbon, photographic or other reproduction of a financing statement or this Agreement (which shall be sufficient as a financing statement hereunder), and any specific assignments or other paper that may be reasonably necessary or desirable, or that the Secured Party may request, in order to create, preserve, perfect or validate any Security Interest or to enable the Secured Party to exercise and enforce its rights hereunder with respect to any of the Collateral.  (All of such documents referred to in the preceding sentence, with the exception of this Agreement, are hereinafter referred to as the "Financing Statements".)  The Debtor hereby appoints the Secured Party as the Debtor's attorney-in-fact to execute and file, in the name and on behalf of the Debtor, any additional Financing Statements as the Secured Party may request.

Section 3.    <u>Representations and Warranties of Debtor</u>.  The Debtor hereby represents and warrants as follows:

3.1    The Debtor is the owner of the Collateral.

3.2    The Debtor is a [***resident of the State of _____ / registered organization in the State of _____].

3.3    The [***Social Security Number / federal Employer Identification Number] of the Debtor is _____.

3.4    To the extent of its ownership interest in the Collateral, the Debtor has full right, power and authority to grant to the Secured Party the Security Interest pursuant to the terms of this Agreement.

3.5    Each account, healthcare insurance receivable, instrument, investment property, chattel paper, letter-of-credit right, letter of credit, other right to payment, document, and general intangible constituting Collateral is, or will be when acquired, the valid, genuine and legally enforceable obligation of the account debtor or other issuer or obligor named therein or in the Debtor's records pertaining thereto as being obligated to pay such obligation, subject to no defense, setoff or counterclaim.

Section 4.    <u>Covenants of the Debtor</u>.  The Debtor hereby covenants and agrees as follows:

4.1    Except for senior perfected liens or security interests, the Debtor will defend the Collateral and the Security Interest against all claims and demands of all persons at any time claiming any adverse interest with respect thereto.

4.2    The Debtor will not sell or offer to sell or otherwise assign, transfer or dispose of the Collateral or any interest therein without the prior written consent of the Secured Party.

Operating Agreement of Renewal Care Partners LLC

4.3     The Debtor has not used any trade name, assumed name, or other name except the Debtor's name stated above.  The Debtor shall not change its state of organization without the Secured Party's prior written consent.  The Debtor shall give the Secured Party prior written notice of any change in such address or the Debtor's name or if the Debtor uses any other name.

4.4     The Debtor shall: (i) keep all tangible Collateral in good condition and repair, normal depreciation excepted; (ii) from time to time replace any worn, broken or defective parts thereof; (iii) promptly notify the Secured Party of any loss of or material damage to any Collateral or of any adverse change in the prospect of payment of any account, instrument, chattel paper, other right to payment or general intangible constituting Collateral; (iv) not permit any Collateral to be used or kept for any unlawful purpose or in violation of any federal, state or local law; (v) keep all tangible Collateral insured in such amounts, against such risks and in such companies as shall be acceptable to the Secured Party, with lender loss payable clauses in favor of the Secured Party to the extent of its interest in form acceptable to the Secured Party (including without limitation a provision for at least 30 days' prior written notice to the Secured Party of any cancellation or modification of such insurance), and deliver policies or certificates of such insurance to the Secured Party; (vi) at the Debtor's chief executive office, keep accurate and complete records pertaining to the Collateral and the Debtor's financial condition, business and property, and provide the Secured Party such periodic reports concerning the Collateral and the Debtor's financial condition, business and property as the Secured Party may from time to time request; and (vii) at all reasonable times permit the Secured Party and its representatives to examine and inspect any Collateral, and to examine, inspect and copy the Debtor's records pertaining to the Collateral and the Debtor's financial condition, business and property.

Section 5.     Remedies Upon Default.  If any default hereunder or under the Note has occurred, the Secured Party may exercise all of the rights and remedies of a secured party under the Uniform Commercial Code, as adopted in the State of New York, and, in addition, the Secured Party may, without being required to give any notice, except as herein provided or as may be required by mandatory provisions of law, (a) apply the cash, if any, then held by it as Collateral in the manner specified in Section 6 hereof, and (b) if there is no such cash or if such cash is insufficient to pay all of the Obligations in full, sell the Collateral, or any part thereof, at public or private sale, for cash, upon credit or for future delivery, and at such price or prices as the Secured Party may deem satisfactory.  The Secured Party shall give the Debtor not less than ten (10) days' prior written notice of the time and place of any sale or other intended disposition of any of the Collateral.  The Secured Party may require the Debtor to assemble all or any part of the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to the Debtor and the Secured Party.  Any holder of the Note may be the purchaser of any or all of the Collateral so sold at any public sale (or, if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations, at any private sale) and thereafter hold same, absolutely free from any right or claim of whatsoever kind.  Upon any such sale, the Secured Party will have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold.  Each purchaser at any such sale will hold the Collateral so sold absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption of the Debtor.  Any such public sale will be held at such time or times within ordinary business hours and at such place or places as the Secured Party may fix in the notice of such sale.  At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels, as the

Secured Party may determine. The Secured Party is not obligated to make such sale pursuant to any such notice. The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be adjourned. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by the Secured Party until the selling price is paid by the purchaser thereof, but the Secured Party will not incur any liability in the case of the failure of such purchaser to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may again be sold upon like notice. The Secured Party, instead of exercising the power of sale herein conferred upon it, may proceed by a suit or suits at law or in equity to foreclose the Security Interest and sell the Collateral, or any portion thereof, under a judgment or decree of a court of competent jurisdiction.

Section 6.    Application of Collateral and Proceeds. The proceeds of any sale of, or other realization upon, all or any part of the Collateral will be applied in the following order of priorities:

6.1    First, to pay the expenses of such sale or other realization, and all expenses, liabilities and advances incurred or made by the Secured Party in connection therewith, and any other unreimbursed expenses for which the Secured Party is to be reimbursed pursuant to Section 7 hereof;

6.2    Second, to the payment of the Obligations in such order or manner as the Secured Party, in his sole discretion, determines;

6.3    Third, to the payment of claims secured by any subordinate security interest against the Collateral if the holder of such security interest provides to the Secured Party a timely authenticated demand for payment out of the sale proceeds; and

6.4    Finally, to pay to the Debtor, or its successors or assigns, or as a court of competent jurisdiction may direct, any surplus then remaining from such proceeds.

Section 7.    Expenses. The Debtor will forthwith upon demand pay to the Secured Party the amount of any and all taxes or other charges or reasonable out-of-pocket expenses, including the reasonable fees and disbursements of its counsel and of any agents not regularly in its employ, which the Secured Party may incur in connection with (i) the collection, sale or other disposition of any of the Collateral, (ii) the exercise by the Secured Party of any of the powers conferred upon it hereunder, and/or (iii) any default on the Debtor's part hereunder or under the Note.

Section 8.    Miscellaneous.

8.1    Changes in Writing. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

8.2    Waivers; Non-Exclusive Remedies. No failure on the part of the Secured Party to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or

Operating Agreement of Renewal Care Partners LLC

remedy under this Agreement operates as a waiver thereof; nor will any single or partial exercise by the Secured Party of any right, power or remedy under this Agreement operate as a waiver thereof; nor will any single or partial exercise by the Secured Party of any right, power or remedy under this Agreement preclude any exercise of any other right, power or remedy. The remedies in this Agreement are cumulative and are not exclusive of any other remedies provided by law, in equity or otherwise. The Debtor waives trial by jury in any action brought on or with respect to this Agreement.

8.3     Severability. If any provision hereof is held invalid or unenforceable in any jurisdiction, such provision will (for purposes of enforcement in such jurisdiction only) be reduced in scope and effect to the extent necessary to render same enforceable, and the other provisions hereof will remain in full force and effect.

8.4     Governing Law. This Agreement is governed by and construed in accordance with the laws of the State of New York. All terms in this Agreement that are defined in the New York Uniform Commercial Code, as amended from time to time (the "UCC") shall have the meanings set forth in the UCC, and such meanings shall automatically change at the time that any amendment to the UCC, which changes such meanings, shall become effective.

8.5     Section Headings. The headings in this Agreement are for convenience of reference only, and will not limit or otherwise affect the meaning or interpretation of any provision hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be executed as of the day and year first above written.

DEBTOR:

By: _____
Its: _____

SECURED PARTY:

By: _____
Its: _____